MRS. PANSY SMART LANN *v.* THIRD NATIONAL BANK IN
NASHVILLE.

(*Nashville,* December Term, 1954.)

Opinion filed March 11, 1955.

MILES, BUTLER, CORBITT & McCALL, of Nashville, for appellant.

FARRIS, EVANS & EVANS and JOHN D. MOSBY, all of Nashville, for appellee.

MR. JUSTICE BURNETT delivered the opinion of the Court.

The appellant sued the appellee for what she terms interference with and injury to the business of the appellant. The appellee says, that the bill is a suit for (a) "slander of property, based upon the alleged false and defamatory matter obtained in the original bill in a prior case, and (2) moral or business duress based alike on said alleged false and defamatory matter and other facts and circumstances, * * *." The bank demurred to the bill and this demurrer was sustained by the Chancellor.

In due season the appellant, (complainant below) has perfected her appeal. We have spent considerable time in reading the excellent briefs of counsel and all of the authorities cited therein and other authorities that are pertinent to the matter. It has been indeed an interesting lawsuit. The matter is now reached by us for determination.

■ The appellant's theory of this lawsuit is based upon a note contained in 9 A. L. R. (2d) 230, 271, inclusive and various cases therein referred to. At the outset of this note the author states that one's business is entitled to protection "from tortious interference by a third person who, in interfering therewith, is not acting in the exercise of some right, such as the right to compete for business." Page 232 of 9 A. L. R. (2d), supra. Among the many cases cited by the author as authority for this statement are a few Tennessee cases, such as *Shell Oil Co. v. State Tire & Oil Co.,* 6 Cir., 1942, 126 F. (2d) 971; *Hutton* v. *Watters,* 132 Tenn. 527, 179 S. W. 134, L. R. A. 1916B, 1238, Ann. Cas. 1916C, 433, in which this Court overruled an earlier case of *Payne* v. *Western & A. R. Co.,* 81 Tenn 507. Under this theory the author of the note correctly points out that malice or ill will or wrong motive is necessary before the act done is actionable. The author says that it "is the intentional doing of a harmful act without justification or excuse, and it is from that point of view that the following cases are cited to the proposition that malice on the part of the defendant renders his interference with such trade relationships of another as come within the scope of the present discussion",—and make what is done actionable. Cases from many jurisdictions are then cited as authority for this proposition.

Counsel for the appellant cite the case of *Krigbaum* v. *Sharbaro*, 1913, 23 Cal. App. 427, 138 P. 364, (this case is cited in 241 of the A. L. R. note hereinbefore referred to) as authority for the action here taken by the appellant. In this case the California court held that an actionable wrong was committed when the defendant by threat, intimidation, and coercion, interfered to prevent the sale of real estate by a broker to a purchaser whom he had interested in the property, although at the time the negotiations had not reached the point of a contract. As we see the matter this, though, is an entirely different proposition from that as set out in the case now before us, even though the factual situation up to a certain point in the two cases are exactly parallel.

The bill in this cause (we have read the bill three times) alleges that in October 1952, and for sometime prior thereto the appellant was the owner and operator of a tourist court with considerable acreage in connection therewith on one of the main thoroughfares near the City of Nashville. It is said that at that time the property was mortgaged for, in the neighborhood of, $14,000. The bill also says that sometime prior to October 1952, the appellant being indebted to the appellee herein in the amount of $2,675, went to the appellee in an effort to borrow sufficient sums of money to refinance her mortgage and to take care of the amount that she was due the appellee, offering to give the appellee (Bank) the mortgage on the property. The Bank declined to make the loan. Thereafter, the property was advertised by the holder of the mortgage (one holding the mortgage not named herein) for foreclosure and the appellant not being able to satisfy the mortgage holder or to arrange for a new mortgage to pay this one off with the costs, which at that time

amounted to some $16,000, she entered into an arrangement with another party whereby she conveyed the property in fee to this party for a stated consideration of $16,000. The appellant alleges that she then executed or that the third party in this transaction executed an instrument to her agreeing to and giving her an option to repurchase the property at any time within a year for the sum of $18,000, the appellant likewise renting the property back from this third party. The deed was recorded but the lease and option to repurchase were not.

She then says that sometime prior to June 9, 1952, she was contacted by attorneys for the appellee (Bank) in an effort to collect the $2,000-odd-dollars which she owed the bank. She says that during the course of negotiations it was suggested to her that she give as security for her indebtedness to the Bank (appellee) a pledge of the redemption agreement or option to repurchase between her and the third party that she had conveyed the property to. This she refused to do. She says that after fruitless talks with the bank's (appellee) lawyers she went to see an officer of the Bank and that he was very rude to her but that he did eventually agree that he would try to help her find a purchaser for the property and he told her to go to see a real estate firm and tell them that he had sent her there. Shortly thereafter, that is, probably that day the appellee (Bank) filed its original bill against her alleging the facts or alleging things which are the gravamen of the present lawsuit.

The appellant further alleges in this bill that immediately prior to the filing of this suit this real estate firm, that the bank official had sent her to, came out and looked at her property and valued it at $40,000 but suggested that she list it with them for $37,500. She says that the next

day she went to this firm to list it with them but could not see the man that she went to see and finally did get him that day on the telephone and he told her that he had lost interest in the property and could not sell it due to the unfavorable publicity which had appeared in the morning paper in Nashville about this property. This publicity grew out of the suit against her under the above allegations.

What we have above said is really the gravamen of all sections of the bill until we get to the last section, Subdivision VI, which is:

"Because of the disgraceful allegations made by defendant in its aforesaid suit, which was given wide publicity, complainant was unable to obtain a respectable offer to purchase said property."

She then alleges that she was unable to sell her property between the time of the filing of this suit June, 1953 and October, 1953; that she was approached just a few days before her option to repurchase the property from the third party had expired by representatives of the Tennessee Real Estate Company and another person who offered to give her $23,500 for her property; that after this offer was made she accepted it, paid off the party to whom she had conveyed the property in the first instance, paid the bank, paid the real estate firm some $1,100 and had $313 left for herself. It probably is inferable under the demurrer to the bill that the appellee (Bank) was back of this transaction wherein her property was finally conveyed to Bethel, as she says that they furnished him with $21,000 of the $23,000 that he put up. She then charges that by reason of these different things that:

"Thus, through the pressure, maneuvering and misrepresentations of defendant, complainant's

equity has been dissipated, sacrificed and squeezed down to the paltry sum of $313.00, as alleged in paragraph V hereof: whereas, except for defendant's persistent and unconscionable efforts to victimize complainant in the pursuit of its covetous design to recover 'its pound of flesh', complainant would have been reasonably entitled to and could have realized at least, $11,500.00 from her equity therein.''

She says that she was charged with ''entering into by the parties thereto with the purpose and intent of hindering, delaying, misleading and defrauding complainant and other creditors similarly situated, of their just claims''; that she had one or two nibbles about selling her property in the early stages but that as soon as the parties found out that it was the same property as was mentioned in this bill (that the Bank (appellee) filed against her) that they flew the coop, so to speak. She says that all of these allegations of this bill (that the Bank filed against her) were demurred to and answered in which she completely denied the truth of these averments. She also says, in this bill, that after these demurrers and answers were filed denying the averments of it that the bank voluntarily dismissed the suit and paid the costs of the suit. She alleges that: ''Because of defendant's said allegations of fraud, etc., complainant was forced to sell the real estate in question for $23,000.00 in order to meet defendant's crushing and unconscionable demands as hereinafter set out.''

The bill was demurred to, first, on the ground that it showed on its face that these alleged false and defamatory matters which caused the complainant (appellant here) damages were contained in pleadings in a prior case and that they were pertinent to the issues involved

in that case and were therefore absolutely privileged; second, that insofar as it might be considered an action for moral or duress of property (a) no facts were stated in the bill, either singularly or in combination, upon which the action of duress of property might be predicated; (b) that the facts stated in the bill showed that the complainant had waived any action, if any, which she had and that no grounds were stated upon which relief could be granted. As said before the Chancellor sustained the demurrer as a whole without comment.

After a very careful study of the bill herein we are forced to the conclusion that all the reasons stated in the bill for the depreciation and value of this property arose: "Because of the defendant's said allegations of fraud, etc., complainant was forced to sell the real estate in question for $23,500.00 in order to meet the defendant's crushing * * * because of disgraceful allegations made by defendant in its aforesaid suit * * * giving all of the false, malicious, sordid and damaging details alleged in the aforesaid bill filed by the Third National Bank * *" These quotations are merely samples or the gravamen of each paragraph in the bill. Paragraph No. IX does not make such charges but the allegations are that through "maneuvering and misrepresentations of defendant, complainant's equity has been dissipated, sacrificed and squeezed down, etc." are attributable to the preceding allegations of what caused this depreciation in property—there are no other factual averments which did cause such depreciation other than what is alleged that grew from the bill that the Bank filed against the appellant. This being true it seems to us that regardless of what kind of a suit this is, whether slander of property, duress of property or injury to business that

the things done to cause any one of these eventually stem from and grew out of the publicity and charges made in the bill that the Bank filed against the appellant.

After an examination of the bill filed by the Bank against this appellant, and others, we believe that the allegations therein made were pertinent. The bill alleges that the deed attacked therein is a mortgage and not a warranty deed in truth and it was sought to have this so declared. Under the circumstances of the averment, since the deed was an absolute deed on its face and the agreements to reconvey, etc., were secret, it seems to us that the allegations made in the bill were pertinent thereto. It is true that these allegations of constructive and actual fraud were indeed very strong but they were based upon, in the eyes of the bank or their attorneys, what they thought was necessary to protect their interest in the premises. Thus it would seem to us that such allegations were clearly pertinent to that case. This Court a hundred years ago decided that when statements of the kind were made by a pleader that such statements were privileged, if those filing the bill fairly believed them to be necessary to state these things in the cause. The case to which we refer is that of *Lea* v. *White,* 36 Tenn. 111, 113, 115, which has been approved by this Court many times since. Mr. Justice Shields speaking for this Court in *Cooley* v. *Galyon,* 109 Tenn. 1, 14, 70 S. W. 607, 609, 60 L. R. A. 139, 97 Am. St. Rep. 823, reviewed the textbook decisions and authorities on the question here fully and quoted with approval from *Lea* v. *White,* supra, as follows:

 " 'There is class of cases which are absolutely privileged, and depend in no respect for their protection upon their bona fides. The occasion is an

absolute privilege, and the only questions are whether the occasion existed, and whether the matter complained of was pertinent to the occasion. In this class are embraced judicial proceedings. The proceedings connected with the judicature of the country are so important to the public good that the law holds that nothing which may be therein said with probable cause, whether with or without malice, can be slander, and, in like manner, that nothing written with probable cause under the sanction of such occasion can be libel.' ''

■ The reason for this rule is stated very succinctly by the Supreme Court of Alabama in *Coffman* v. *Henderson,* 9 Ala. App. 553, 63 So. 808, 810 thus:

"otherwise every failure to maintain a title or lein claim to or upon property, or every error of judgment or mistake made in the assertion of such claim, or suit brought to enforce it, however honestly and sincerely done, would subject a party to suit and mulct him in damages."

This is the generally accepted reason for the rule above quoted from *Lea* v. *White,* supra, by the cases over the country. The rule seems to us sound. Obviously the reason for the rule lies, not in whether it is a suit for libel or slander or what form the action on which their falsity is based takes but in the fact that in the interest of justice litigants are protected against suits made upon the falsity of allegations which are made in good faith, regardless of what kind of an action it is. Thus it seems to us that it would make no difference what we call this action there can be no liability under the allegations of this bill because it seems to us that the allegations of the bill of the bank were pertinent to the issues therein.

▇ It certainly seems to us that under the theory of the Bank in the original suit out of which all of this grew that under the Bank's theory the facts as alleged were pertinent and necessary to the issues of that suit.

> "The parties, or their representatives, are entitled to state any thing which, although not strictly relevant, may be fairly supposed by them to weigh with the court. (Citing authorities)". *Lea* v. *White,* supra.

This being true, that is, that the things which caused the instant lawsuit being privileged, that if privileged for one purpose they must be privileged for all others.

▇ We have spent about an hour reading the opinion in the case of *Johnson* v. *Ford,* 147 Tenn. 63, 245 S. W. 531. This opinion is thirty-odd pages in the printed reports. A good portion of the opinion is taken up by the Court with the definition and quotations from many states in the Union on the theory of duress of property. The complainant herein says that this action is not for duress of property but is for the injury to her business. One reading the statements from the various cases as quoted in *Johnson* v. *Ford,* supra, sees many similar factual statements to that of the instant case. But in none of those cases, from our investigation, was there a previous court action upon which the action for duress of property was therein based. As far as we can see and find all of the authorities agree to the proposition that in a suit for duress of property the duress must be wrongful, tortious, or unlawful. *Johnson* v. *Ford,* supra; 17 Am. Jur., 878, 879, 880; 17 C. J. S., Contracts, Sec. 177, p. 536, and cases there cited.

The complainant in her bill herein alleges certain specific acts on the part of the appellee (Bank) upon which

she bases her cause of action. She says that the refusal of the Bank to make her a loan so as to avoid the foreclosure proceedings is one; and the false statements of the bank as made in the lawsuit which they afterwards filed is another; that the threats of the Bank to take legal action if she did not do something about paying them is another and that the Bank led her to believe that they would list her property for sale and then surreptitiously repudiated this agreement and brought suit. We have carefully analyzed each of these things, and as we tried to say heretofore, the basic spring out of which all of these elements of damage grew were the allegations of fraud and the publicity received by reason of these allegations in the lawsuit under which we think these statements were clearly privileged and not the basis of a lawsuit. It seems to us that the Bank clearly had a right to refuse to make a loan if they did not think that the credit was sufficient. Then of course as we have said heretofore the false statements that are alleged to have been made and under the pleadings as we have them here were false, were clearly privileged. The threats of legal action which under the demurrer to the bill are true would constitute no basis for this suit where there is a legitimate suit brought, as was here. Then her statement about the property being listed with a real estate firm and then suit brought before they had a chance to do anything about it is not really a basis of the action because, among other things, she does not say that in making a commitment to turn this over to a real estate firm that by so doing they agreed or intimated that they would withhold suit against her. In the bill she complained about the fact that the Tennessee Real Estate Company sold her property and that she had to accept

$23,500 from the property which was just a sufficient amount for her to pay her debts and receive $313 over. One analyzing the bill and this statement is bound to only one conclusion, that she agreed with the realty company to pay them a commission for making this sale and that she did so voluntarily. Any damage that she received by reason of selling it for less than she thought it was worth was all due to what she avers in the bill, were charges made in the original bill by the Bank against her.

Thus when we apply the principles above discussed to the instant case it clearly appears to us that the gravamen of the allegations of damage all turn back to the point of the statements and publications therefrom of the lawsuit where the Bank sued Mrs. Lann. Even though these statements were false and malicious, but were spoken in a judicial proceeding, and they were relevant and pertinent to the subject of inquiry in that proceeding they are privileged. This being true it seems to us that the action must fail.