ROBERT T. HAYES, JOHN F. CRANE & JOSEPH J.
CRANE, Individually & d/b/a INGLEWOOD HARD-
WARE & LUMBER COMPANY, NEIL R. EDGE and
W. C. McCORD, Plaintiffs in Error, v.
SCHWEICKART'S UPHOLSTERING CO., and
SCHWEICKART'S SALES, INC., Defendants in Error.
—402 S.W.(2d) 472.

Middle Section.   December 31, 1965.

Certiorari Denied by Supreme Court April 18, 1966.

444

George H. Cate, Jr., and J. Victor Barr, Jr., Nashville, for plaintiffs in error.

Eugene Jackson, Jr., and Tyree B. Harris, III, Nashville, for defendants in error.

PURYEAR, J. This is a suit for damages for loss of business resulting from an alleged conspiracy.

Schweickart's Upholstering Company and Schweickart's Sales, Inc., both of which are domestic corporations, filed the suit against Robert T. Hayes, John F. Crane and Joseph J. Crane individually, and d/b/a Inglewood Hardware & Lumber Company, and Neil R. Edge and W. C. McCord.

For the sake of convenience, we will refer to the parties herein as plaintiff and defendants as they appeared in the trial court.

## STATEMENT OF THE CASE

For several years prior to 1947, Mr. Joe Schweickart, now deceased, operated a small shoe repair and upholstering business in Davidson County, and in October, 1947, Mr. Schweickart entered into a written lease contract with the defendants Robert T. Hayes and John F. Crane, by which he leased a certain building on Gallatin Pike, in Davidson County, Tennessee, from the defendants Hayes and Crane for a period of five years commencing November 1, 1947, and ending October 31, 1952,

for which he agreed to pay a rental of $125.00 per month for the first twelve months and $150.00 per month for the next four years.

Upon leasing this building, Mr. Schweickart moved his upholstering and shoe repair business into the building and from a small shoe repair and upholstering business, it soon grew into a small factory principally engaged in the manufacture of boat seats, the principal customers for that business being two boat manufacturers in Nashville, namely, Glasspar and Fabuglas.

This written lease expired on October 31, 1952, but Mr. Schweickart continued to occupy and use the building, with consent of the defendants, but as the business grew, more space was required and additions were made by the lessors from time to time and, by agreement between the parties, the monthly rental was increased until it finally reached $355.00 per month.

Although the defendant, Joe Crane, was not a partner in Inglewood Hardware and Lumber Company at the time the lease was signed, he became a partner in 1949.

Mr. Schweickart's business continued to prosper and in 1959 he changed the legal status of his business by forming two corporations, namely, Schweickart's Upholstering Company, and Schweickart's Sales, Inc., and, as far as the record discloses in this case, he owned all of the stock in both corporations. Prior to the forming of such corporations, however, Mr. Schweickart became less active in the business and went into semiretirement in 1958.

The defendant, Neil Edge, was employed by Schweickart in 1947 and McCord was employed in 1952, and, up until the time of the controversy out of which this litiga-

tion arose, Edge and McCord were trusted and valuable employees of the business, the defendant Edge finally being entrusted with management of sales and the defendant McCord entrusted with management of production.

Although there was not any written renewal of the original lease, the two plaintiff corporations continued to occupy the premises leased from Inglewood Hardware and Lumber Company, up until about September 28, 1963, as will hereinafter be shown.

Mr. Schweickart died in August, 1960, and left his widow, Mrs. June Schweickart, and several children surviving him. Afterwards, Mrs. Schweickart and one of Mr. Schweickart's children namely, Mrs. L. C. Norman, bought all of the shares in the two corporations owned by the other heirs of Mr. Schweickart and thereupon became the owners of such shares in the following proportions: Mrs. Schweickart owned two-thirds and Mrs. Norman owned one-third, and this ownership continued to exist up until the time this litigation was commenced.

On September 30, 1960, Schweickart's Sales Inc., made and entered into a written contract with the defendant Edge, by the terms of which it employed him as manager for a period of three years from the date of such contract, which provided for compensation of $10,400.00 per annum and a bonus equivalent to 5% of the combined net earnings of Schweickart's Upholstering Company and Schweickart's Sales Inc., before provision for state and federal taxes, and before any salary payments to Mrs. June Schweickart.

On the same date, the other corporation, Schweickart's Upholstering Company, made the same contract with the defendant McCord, for the same period of time.

Both of these contracts provided that during the term thereof McCord and Edge would not acquire or hold any interest as stockholder, director, agent, or otherwise, in and for any corporation in competition with the plaintiffs, not to engage in any business competing with that of the plaintiffs, not to impart to any competitor of plaintiffs or otherwise use for the purpose of competition with the plaintiffs, any confidential information which they may acquire in the performance of their duties.

Although these contracts do not provide for it, Edge was elected president of Schweickart's Sales, Inc., and McCord was elected president of Schweickart's Upholstering Company.

The business of the plaintiffs continued to prosper under the management of these two defendants during the period of these contracts, although one year was a bad year for the boat business and the profit for that year was short of expectations.

Relations between the owners of the corporations and the managers continued to be good up until the summer of 1963, at which time Mrs. Schweickart and the managers had several discussions concerning renewal of their contracts, since they were about to expire, but these discussions did not result in any agreement to renew the contracts, although Mrs. Schweickart contends that she offered to continue the arrangement as it existed under the contracts, but without any definite tenure for such arrangement.

Some dissension arose between Mr. Edge and Mrs. Norman about Mr. Edge's allegation that Mrs. Norman was not devoting sufficient time to her duties as bookkeeper for the two corporations.

The defendants, Edge and McCord, wished to buy stock in the corporations, it being the contention of Mrs. Schweickart that they wished to buy 52% thereof so as to control the business, but the defendants, Edge and McCord, insist that they wanted to buy 50% or less.

Failure of the owners of the business and managers thereof to agree, finally resulted in the managers formally notifying Mrs. Schweickart, both orally, and by subsequent letters dated September 20, 1963, that from and after October 1, 1963, all connections between them and plaintiff corporations would be severed.

After being so notified of this intended severance, Mrs. Schweickart and Mrs. Norman, obtained a new manager, namely, L. C. Norman, husband of the minority stockholder, Mrs. Norman, and after his appointment, Mr. Norman notified Edge and McCord on September 27, 1963, that their services were no longer needed and they were paid their salaries up to and including September 30, 1963.

On September 3, 1963, Mr. Earl A. McNabb, Attorney for Inglewood Hardware & Lumber Company, wrote Mrs. Schweickart the following letter, which she received almost immediately thereafter and it is filed as plaintiff's exhibit number two to deposition of Joe Crane.

"September 3, 1963
Mrs. June Schweickart
108 Graycroft Ct.
Madison, Tennessee

Dear Mrs. Schweickart:

I represent Inglewood Hardware Company, owner of the property 3212 Gallatin Road, Nashville, Tennessee.

This is the property in which Schweickart Upholstering Co. is located. My client wish to advise you that the rental on this property will be advanced to $600.00 per month beginning in October 1963. They asked that I write you this letter and advise you of this fact.

Also my client desire that you can continue to rent this building provided you are willing to enter into a lease for 10 years at $600.00 per month, payable in advance. If this is not agreeable it is desired by my clients that you vacate this building by October 3, 1963.

Please be governed accordingly and if there are any questions please call my clients or myself.

Very truly yours,
s/s Earl A. McNabb,
Earl A. McNabb,
Attorney

cc: Mr. Joe Crane
c/o Inglewood Hardware Co.
3214 Gallatin Road,
Nashville, Tennessee.''

Mrs. Schweickart's attorney, Mr. Thomas M. Evans, replied to this letter as follows:

''September 23, 1963

Mr. Earl A. McNabb
Attorney at Law
213 Third Avenue, North
Nashville, Tennessee

Dear Earl:

Your letter of September 3, 1963, addressed to Mrs. June Schweickart, 108 Graycroft Court, Madison, Tennessee, has been handed to me for reply.

Mrs. Schweickart and Schweickart's Upholstering Company are unable to meet the demands of your client. Therefore, this is to advise that we will vacate the property as requested.

It is a little strange that your client after all these years would be so harsh as to give these people only thirty days' notice, but we have rented another building and will do everything possible to get out on the 3rd as demanded.

Sincerely,
Thomas M. Evans
TME/mc

cc: Mr. Joe Crane
c/o Inglewood Hardware Co.
3214 Gallatin Road
Nashville, Tennessee.'' (Plaintiffs Exhibit Number 7)

However, the plaintiffs moved practically all of their fixtures, stock, and equipment from the building on or prior to September 28, 1963, and placed padlocks on the building, contending that they had a few items left therein.

On September 30, 1963, the defendants took possession of the building and commenced the operation of a competitive business therein, known as Crane Upholstering Company, on or about October 1, 1963, after the plaintiffs had moved to another location on Jefferson Street, in the City of Nashville.

Most of the employees of the plaintiffs went to work for the defendants in the new business and within a few weeks thereafter the plaintiffs lost their principal customers, Glasspar and Fabuglas, to the defendants. This loss

of business resulted in a loss of profits to plaintiffs and also resulted in the filing of this suit.

On the 20th day of November, 1963, plaintiffs filed this suit in the Circuit Court of Davidson County, in which they sued the defendants for $350,000.00 damages.

Plaintiffs' declaration contains two counts, but it is not necessary for us to summarize the declaration or the pleas to any extent, except very briefly, since no question is raised herein which concerns the pleadings.

In the first count of their declaration, the plaintiffs alleged in substance that the defendants entered into an unlawful and fraudulent conspiracy in an effort to destroy plaintiffs' business; that in pursuance of such fraudulent, unlawful and wrongful conspiracy, the defendants and each of them was successful in obtaining the vast majority of the plaintiffs' employees and practically all of their business, and in addition thereto, in the furtherance of such alleged conspiracy, the plaintiffs were unlawfully and fraudulently forced by the defendants to vacate the premises where their business had been successfully conducted.

In the second count of their declaration the plaintiffs adopt and reiterate the allegations of the first count and allege that the defendants violated Section 47-1706, Tennessee Code Annotated, which is as follows:

"47-1706. *Procurement of breach of contracts unlawful—Treble damages.*—It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured,

the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of said contract; and the party injured by such breach may bring his suit for said breach and for such damages.''

To this declaration all of the defendants first filed pleas of not guilty, but thereafter, by order of the court, pleaded their defenses specially, in which special pleas they denied the alleged conspiracy, denied that they wrongfully induced plaintiffs' employees to leave the employment of plaintiffs, and denied that they ever sought to prevail upon the principal customers of plaintiffs to cease doing business with them.

In these special pleas, defendants further denied that they violated any of the duties or obligations owed by them to plaintiffs and affirmatively averred that all of the business which came to them after October 1, 1963, came to them in the normal course of trade, without any unlawful conspiracy or any conduct on their part which violated any rights of the plaintiff corporations. In these special pleas, the defendants also denied that they prevailed upon anyone to terminate contracts with plaintiffs.

In reply to the affirmative allegations of the special pleas, plaintiffs joined issue and thereafter a lengthy trial of the case was had before the Circuit Court Judge and a jury, as a result of which trial, the jury found in favor of plaintiffs, awarded them $100,000.00 compensatory damages and $2,000.00 punitive damages.

Within the proper time, all of the defendants filed motions for a new trial, which motions were overruled by the trial judge, from which actions of the jury and the

trial judge the defendants have prayed and perfected an appeal in error to this Court and assigned errors.

## ASSIGNMENTS OF ERROR

The defendants Robert T. Hayes, John F. Crane and Joseph J. Crane, d/b/a Inglewood Hardware and Lumber Company, have filed eight assignments of error as follows:

"1. The trial court erred in failing to sustain their motion for a directed verdict at the close of all the proof.

2. The trial court erred in failing to sustain their motion for a new trial on the ground that the jury verdict was excessive and resulted from unaccountable passion, prejudice and caprice on the part of the jury.

3. The trial court erred in charging the jury as follows:

'Where the evidence, or the witness is equally available, or accessible to both parties, no presumption or inference can arise by reason of his failure to call such witness. This rule concerning a failure to call a witness is applicable only where both parties are equally interested to produce the evidence of such witness.'

4. The trial court erred in charging the jury as follows:

"To establish a conspiracy it is not necessary to prove that any written agreement (was) entered into, or by any particular conversation an agreement was had. It is sufficient, if the evidence shows by a fair preponderance thereof, a working in harmony to promote a common purpose, or a common enterprise; and that each party so engaged received, or was to receive some profit, or benefit from such business or enterprise.'

5. The trial court erred in charging the jury as follows:

'Corporate officers stand in a fiduciary relationship to the corporation, and while occupying such position must act in the utmost good faith. They are not permitted to deal with the corporation for their own private gain; they cannot deal for themselves and for the corporation at one and the same time. Where such corporate officers seek to contract for their private gain, at the expense of their corporation, other parties to such action may not rightfully protest against the application of the rule; for where third parties knowingly participate with the officers of a corporation in the commission of an act of manifest bad faith, or breach of duty to said corporation, they, equally with the officers, commit a wrong and will not be allowed to derive profit from it.'

6. The trial court erred in charging the jury as follows:

'However, one who maliciously and without just cause, or excuse, procures employees to leave the service of their employer is liable to the employer for the resulting damage. Since an employer has a property right in his contracts of employment with his employees, it may not be unlawfully interferred with by another.'

7. The trial court erred in charging the jury as follows:

'Where a lessee enters into possession of property under a lease for one or more years, and continues to remain in possession of the property after the expiration of the lease, with no agreement with his landlord as to the term of any renewal of his lease, the law

construes the lessee to have leased the property from year to year; and for either party to cancel the tenancy, notice must be given to the other party at least six months before the end of a given year.'

8. The trial court erred in charging the jury as follows:

'Even though a landlord may be entitled under the law to possession of the leased premises, and such possession is refused him, he must resort to the Courts to grant him a writ of possession. An act on the part of a landlord to assume the authority of judge, jury and sheriff, by attempting to regain possession of the property by force is subversive to the peaceful process of the law and void.' '' (Pp. 82-83 Brief of Inglewood Hardware & Lumber Co.)

The defendants, Edge and McCord, filed substantially the same assignments of error as those designated one, two, three, four, five and six by the other defendants, and in addition of these six assignments of error, which are substantially the same as the first six filed by the other defendants, these defendants, Edge and McCord, filed the following assignments designated as numbers three, eight and nine:

''3. The overwhelming weight of the evidence was contrary to the finding of the jury that these defendants were liable to the plaintiffs and to the amount of the damages awarded, and the Honorable Trial Court, acting in the capacity of a thirteenth juror, should set aside the verdict and grant a new trial.

8. There was no evidence to sustain the jury verdict against Neil R. Edge and W. C. McCord that either of them breached their contracts of employment with the

plaintiff corporations at any time during the contracts existence, nor does the evidence show that either of them conspired to interfere wrongfully or maliciously with the business of plaintiffs.

9. There was no evidence to sustain the jury verdict against Neil R. Edge or W. C. McCord that they as officers of plaintiff corporations knowingly participated with third parties in an act of manifest bad faith, or a breach of duty to plaintiff corporations, for the purpose to derive profit from such acts.''

■ In determining whether or not the court erred in failing to sustain motions for a directed verdict, we must necessarily review the evidence and determine whether or not there is any material evidence to support the verdict of the jury, which has been approved by the trial judge.

■ The case for plaintiffs was based entirely upon circumstantial evidence, and the rule applicable to civil cases which depend upon circumstantial evidence is stated in Bryan v Aetna Life Ins. Co., 174 Tenn. 602, 130 S.W.(2d) 85, as follows:

"The general rule is that it is sufficient, in a civil case depending on circumstantial evidence, for the party having the burden of proof to make out the more probable hypothesis and the evidence need not arise to that degree of certainty which will exclude every other reasonable conclusion.'' Bryan v. Aetna Life Ins. Co., supra, p. 610, 130 S.W.(2d) p. 88, citing 23 C.J. 49; Jones Com. on Evidence (2 Ed.), Vol. 1, section 12.

The case for the plaintiffs included evidence which can be briefly summarized as follows:

(1) As early as the year 1941, McCord and Edge copied the boat seat patterns of Fabuglas and Glasspar, which were being used by plaintiffs in the manufacture of boat seats for these two makers of boats.

(2) While Mr. Edge denied that during the term of his contract with Schweickart, he had ever attempted to solicit Schweickart's customers to give their business to the new firm, Mr. Jones, the Fabuglas purchasing agent, testified that as far back as July or August, 1963, Edge had discussed with him the possibility of Fabuglas leaving Schweickart and going with the new concern.

(3) The president and general manager of Fabuglas testified that he was advised of Edge's solicitation of this business, and actually gave Edge a commitment for the Fabuglas business some time in August, 1963, which commitment would be good for as long as the new company did satisfactory work and kept it prices in line.

(4) By July 31, 1963, or early in August of that year, Edge and McCord assumed that they could take both the Fabuglas and Glasspar business from Schweickart and so advised one of the plaintiffs' employees, a Mr. Proctor.

(5) In August, 1963, McCord commenced to talk to the Schweickart employees about leaving and going with the new firm. At some time about the last day of August or first of September, 1963, the defendants, Joe Crane and McCord, discussed going into the upholstering business together.

(6) Shortly after this discussion between Joe Crane and McCord, Mr. McNabb, attorney for Inglewood Hardware & Lumber Company, wrote Mrs. Schweickart the above quoted letter demanding a ten year lease at a rental of $600.00 per month.

(7) No preliminary conversations were held by the parties of Inglewood Hardware & Lumber Company and Mrs. Schweickart about a new lease upon any such terms as those demanded in Mr. McNabb's letter.

(8) The partners in Inglewood Hardware & Lumber Company had not discussed any such lease among themselves prior to the time the foregoing letter was written.

(9) While the partners in Inglewood Hardware & Lumber Company did not have any definite plans for use of the leased premises, they gave no consideration to allowing plaintiffs to remain on the premises until such time as they could determine what use they desired to make of them.

(10) Mrs. Schweickart testified that on the day after Mr. McNabb wrote the foregoing letter, he and Mr. Joe Crane met with Edge in the Schweickart offices to discuss some papers to see if they met with Edge's approval.

However, this testimony is vigorously denied by Mr. McNabb and the defendants, Edge and Joe Crane.

(11) At some time around the middle of September, 1963, the defendant, Joe Crane, approached his partner, Robert T. Hayes, and asked him if he wanted to go into the upholstering business and received an affirmative reply.

(12) On or about the night of September 17, 1963, Edge, McCord, Joe Crane and Fritz Crane met in the offices of Inglewood Hardware & Lumber Company and reached an agreement that the four of them, together with Mr. Hayes, who was not present, would go into the upholstering business. At the same meeting it was agreed that materials and supplies would be required in the manfacture of boat seats and that the materials would be

ordered for shipment to Inglewood Hardware & Lumber Company.

(13) On or about September 18, 1963, the defendant, Edge, began to order materials and supplies for the manufacture of boat seats, urging National Lock Company, of Rockford, Illinois, to ship all available brass hinges at once and the balance of the order as soon as possible.

(14) On or about September 19, 1963, the defendants, Fritz Crane and McCord, called a meeting of the Schweickart employees immediately after working hours and offered to employ all of them who did not wish to remain in the employment of the plaintiffs.

(15) On or about September 27, 1963, Mr. Schutt, the new president of Schweickart, called on Mr. Cargile of Fabuglas about continuing their boat seat business but was told by Mr. Cargile that he had told Edge that as long as he gave them service and prices that he had been giving in the past, they would do business with him; that he had made a commitment to Edge and could make no promise of business to Schweickart at that time.

(16) The new firm, Crane Upholstering Company, commenced business on September 30, 1963, when many of Schweickart's former employees reported for work at Inglewood Hardware & Lumber Company yard and started building tables in preparation for entering the building on October 1st.

(17) After the new firm, Crane Upholstering Company, moved into the building formerly occupied by Schweickart, the new firm paid a monthly rental of $355.00, which was $245.00 per month less than that demanded of the plaintiffs, and this rental continued for that amount up until about May or June, 1964.

(18) When the new manager, Mr. Norman, took over the management of plaintiffs' business, their supply of various materials was extremely short.

This summary is not, by any means, a complete summary of all of the evidence introduced by plaintiffs. Much of this testimony introduced by plaintiffs was denied by the defendants and they offered explanations for that which was not denied, and thus two opposing theories were presented to the court and jury.

It is the plaintiffs' theory that some time during the latter part of the summer of 1963, and the early part of the fall of that year, the defendants, each of them knowing of their responsibility to the plaintiffs, and each knowing their responsibility to co-defendants entered into an unlawful and fraudulent conspiracy in an effort to destroy the business of plaintiffs and capture it for a new company, which was later formed by them and that the defendants were successful in wrecking the business of plaintiffs and capturing it for themselves.

On the other hand, it is the theory of defendants that the business of plaintiffs was wrecked by internal dissension, in which Mrs. Schweickart and Mrs. Norman, owners of all of the stock, played major roles, and that after the business was so wrecked, largely by irresponsible and unwise conduct on the part of Mrs. Schweickart and Mrs. Norman, the defendants picked up the broken pieces and built a business for themselves, beginning after all of their obligations to the plaintiffs had ceased to exist, and if the plaintiffs suffered any loss it was not due to any misconduct on the part of the defendants.

The defendants introduced considerable evidence in support of their theory, but the jury accepted plaintiffs'

theory and by its verdict decided that the evidence preponderated in favor of that theory.

■ By applying the rule of circumstantial evidence heretofore quoted from Bryan v. Aetna Life Ins. Co., supra, we have concluded that the facts and circumstances offered in evidence by plaintiffs were sufficient to take the case to the jury as to all the defendants.

■ In Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S.W.(2d) 344, our Supreme Court held that each conspirator is liable for all damages naturally flowing from any wrongful act of a co-conspirator in carrying out the common design.

The defendants insist that Edge and McCord owed no obligation to the plaintiffs which extended beyond September 30, 1963, the expiration date of their contracts, and they did no more than any other reasonable and prudent person would have done to secure their future welfare by making lawful arrangements to go into competing business on October 1, 1963, even though it was necessary for them to make some of these arrangements in advance of the expiration date of their contracts.

■ However, in the face of the evidence introduced in this case, we do not think this position of the defendants is sound and completely overlooks the fact that these two men were officers of plaintiff corporations, and as such officers, were under an obligation which required a higher degree of loyalty than that required by the provisions of their contracts of employment, and this obligation of loyalty extended up until the very last day of their terms of office.

In 19 Am.Jur. (2d) p. 679, it is said:

"Sec. 1272. *Fiduciary duty or relationship.* In a broad sense the directors and officers of a corporation are its agents. While they may not be in the strict sense trustees, it is well established that they occupy a fiduciary, or more exactly a quasi-fiduciary, relation to the corporation and its stockholders. The entire management of corporate affairs is committed to their charge upon the trust and confidence that they will be cared for and managed within the limits of the powers conferred by law upon the corporation and for the common benefit of the stockholders. They are required to act in the utmost good faith, and in accepting the office they impliedly undertake to give to the enterprise the benefit of their care and best judgment and to exercise the powers conferred solely in the interest of the corporation or the stockholders as a body or corporate entity, and not for their own personal interest. Clothed with the power of controlling the property and managing the affairs of the corporation, without let or hindrance, as to third persons the directors and officers are its agents, but as to the corporation itself, equity holds them liable as trustees. Indeed, it is the view frequently and broadly taken that the officers and directors of a corporation are, at least in substance and in many respects, trustees for the corporation or its stockholders." Vol. 19 Am.Jur. (2nd) p. 679, Corporations, Sec. 1272.

The foregoing statement of a principle of law is in accord with the decisions of our Supreme Court in Gillespie v. Branham, 47 Tenn.App. 234, 337 S.W.(2d) 689; Central Bus Lines v. Hamilton National Bank, 34 Tenn. App. 480, 239 S.W.(2d) 583; Dale v. Thomas H. Temple Co., supra; Steward Mfg. Co. v. Steward, 109 Tenn. 288, 70 S.W. 808.

█ Counsel for the defendants vigorously insist that neither of the defendants committed any act which was unlawful, wrongful, or that violated the rights of the plaintiffs. The plaintiffs do not agree with this insistence, but even if it be true, the logical answer to it is found in a portion of a citation from C.J.S. quoted in the briefs of the defendants which is as follows:

"There can be no independent tort for conspiracy unless in a situation where mere force of numbers acting in unison or other exceptional circumstances may make a wrong, and to prove a tort on the basis of mere force of numbers it must be shown that there was some peculiar power of coercion possessed by the combination which an individual standing in a similar relation to plaintiff would not have had. However, an organized body of men working together can produce results very different from those which can be produced by an individual without assistance, because of a greater power of coercion on the part of the combination, and may make oppressive and dangerous that which, if it proceeded from a single person, would be otherwise. The result of this greater power of coercion is that what is lawful for an individual is not the test of what is lawful for a combination of individuals. Accordingly in a great many cases the rule is laid down broadly that, while the act of an individual may not give rise to civil liability, yet the same act committed by several acting in concert may be unlawful and constitute an actionable wrong." Vol. 15 C.J.S. Conspiracy sec. 8, p. 1002.

This rule has been followed in Tennessee in Bailey v. Master Plumbers, 103 Tenn. 99, 52 S.W. 853, 46 L.R.A. 561. In that case, at pages 118 and 119, 52 S.W. 853, the

Supreme Court, speaking through Mr. Justice Caldwell, said:

"The individual right is radically different from the combined action. The combination has hurtful powers and influences, not possessed by the individual. It threatens and impairs rivalry in trade, covets control in prices, seeks and obtains its own advancement at the expense and in the oppression of the public.

The difference in legal contemplation, between individual right and combined action in trade is seen in numerous cases." Bailey v. Master Plumbers, supra, p. 118, 52 S.W. p. 857.

Therefore, we overrule assignment of error number one filed by the defendants Edge and McCord, and Inglewood Hardware & Lumber Company, and assignments eight and nine filed by the defendants Edge and McCord.

■ In assignment of error number three, filed by Inglewood Hardware & Lumber Company, and assignment of error number four, filed by the other two defendants, Edge and McCord, the defendants complain of the instruction of the court on the rule concerning failure to call a witness.

We have considered this instruction and find that under the holding in Stevens v. Moore, 24 Tenn.App. 61, 139 S.W.(2d) 710, the instruction was proper, and therefore, we overrule the assignments of error challenging such instruction.

In assignment of error number four filed by Inglewood Hardware & Lumber Company, and number five filed by Edge and McCord, defendants complain of the instruction of the court on the quantum of the evidence required to prove a conspiracy.

■■ By considering this instruction in context with the entire charge of the court, as we are required to do, we find no error in it and overrule the assignments of error by which it is challenged.

In assignment of error number five, filed by Inglewood Hardware & Lumber Company, and number six filed by Edge and McCord, the defendants complain of the court's instruction defining the rights and duties of corporate officers.

■■ We find this instruction consistent with the rule laid down in Gillespie v. Branham, Central Bus Lines v. Hamilton National Bank, Dale v. Thomas H. Temple Co., and Steward Mfg. Co. v. Steward, all of which have been herein cited.

■■ We also find the instruction consistent with the rule stated in 19 C.J.S. p. 107, which is as follows:

"A corporate officer must at all times be loyal to his trust and act in good faith and unselfishly toward the corporation and its stockholders, and cannot assume positions in conflict with the interests of the corporation; but the restrictions on their activities growing out of the fiduciary status extend only to such corporate interests as exist at the time or may reasonably be expected in the development of the corporate business. If the officers transcend or abuse their powers, they are as much responsible to their principal as the agent of an individual is to him."

"A mere employee does not ordinarily occupy a position of trust or confidence toward the corporation unless he is also its agent. On the other hand, one employed as manager of a corporation under the control and direction of the president and board of directors has

been held to be an employee in a quasi fiduciary capacity, and, as such, bound to protect the interests of his employer." Vol. 19 C.J.S. Corporations sec. 761b, page 107.

In assignment of error number six, filed by Inglewood Hardware & Lumber Company, and number seven, filed by Edge and McCord, defendants complain of the instruction of the court concerning liability of a person who procures employees to leave the service of their employer.

Although there is no evidence in this case that the plaintiffs had any contracts with any of their employees, except Edge and McCord, for any definite period of time, we do not think this instruction would necessarily impart to the jury the assumption that they had contracts with any of their other employees, and by considering the instruction in context with the entire charge of the court, we think it can be fairly inferred that by reference to "contracts of employment", the trial judge meant contracts between the plaintiffs and the defendants, Edge and McCord, and, therefore, we find no error in this instruction. .

In assignment of error number seven, filed by Inglewood Hardware & Lumber Company, it is insisted that the court erroneously instructed the jury concerning the rights of a tenant who holds over after the expiration of a lease for a year or more.

We find this instruction exactly in accord with the holding of this Court in Smith v. Holt, 29 Tenn.App. 31, 35, 193 S.W.(2d) 100, and it appears that the language used by the trial judge in this instruction is almost exactly the same language used by this Court in Smith v. Holt, supra.

468

Therefore, we find no merit in this assignment of error.

██ In assignment of error number eight, filed by Inglewood Hardware & Lumber Company, it is insisted that the trial judge committed error in his instruction to the jury on the rights and liabilities of a landlord who fails to resort to the courts for a writ of possession, and dispossesses his tenant without resort to such legal process.

We find this instruction well supported by the decision of this Court in Cutshaw v. Campbell, 3 Tenn.App. 666, and, therefore, we find no merit in this assignment of error.

The defendants, Edge and McCord, insist in another assignment of error that the overwhelming weight of the evidence was contrary to the finding of the jury.

██ However, we are bound by the rule that makes it our duty to take the strongest, legitimate view of all the evidence to uphold the verdict, and to disregard all evidence and inferences to the contrary, and if the verdict is supported by any material evidence, having been approved by the trial judge, it must be sustained, and we cannot weigh the evidence for the purpose of determining whether it preponderates in favor of or against the verdict. McAmis v. Carlisle, 42 Tenn.App. 195, 300 S.W.(2d) 59; Benson v. Fowler, 43 Tenn.App. 147, 306 S.W.(2d) 49; Callahan v. Town of Middleton, 41 Tenn. App. 21, 292 S.W.(2d) 501.

Therefore, we must overrule this assignment of error.

In assignment of error number two filed by all of the defendants, they insist that the amount of the jury verdict was excessive.

Mr. John T. Hicks, a public accountant, testified that, in his opinion, the value of the corporations would be approximately five times their annual earnings and, according to Mr. Hicks' testimony, the combined annual earnings of the two plaintiff corporations, after deducting taxes, and all salaries and expenses, for the five year period immediately preceding the time when defendants set up their competitive business, amounted to more than $200,000.00. (Testimony of John T. Hicks, B. of E. pp. 158-214)

Furthermore, on this question of damage, Mr. L. C. Norman testified as follows:

"Q. What are your present plans, Mr. Norman, about the continued operation of this business, in view of the facts that it's losing a very substantial amount of money?

A. If something unforeseen doesn't happen in the near future, it will be closed as of the end of this year, which will be June 30th." (Testimony of L. C. Norman, B. of E. p. 360)

Therefore, we do not think the amount awarded by the jury as compensatory damages is excessive, in view of the evidence which was before the jury on that question.

In their briefs, defendants' counsel do not question the amount of $2,000.00 awarded as punitive damages.

This disposes of all of the assignments of error and we find no reversible error in any of them. Therefore, all the assignments of error are overruled and the judgment of the trial court is affirmed with costs.

Shriver and Humphreys, JJ., concur.