IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 4, 2000 Session

# FTA ENTERPRISES, INC. v. POMEROY COMPUTER RESOURCES, INC., and DANIEL K. COLE

**Direct Appeal from the Circuit Court for Sullivan County**
**No. C2402     Hon. John S. McLellan, III, Circuit Judge**

**FILED FEBRUARY 12, 2001**

**No. E2000-01246-COA-R3-CV**

In this action for interference with business relations, interference with contract, breach of fiduciary duty, et., a jury awarded both compensatory and punitive damages in differing amounts against the defendants. The Trial Judge approved the jury verdicts and defendants have appealed. We affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

HERSCHEL PICKENS FRANKS, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

Stephen E. Roth, Knoxville, Tennessee, for Appellant, Pomeroy Computer Resources, Inc.

Mark S. Dessauer, Kingsport, Tennessee, for Appellant, Daniel K. Cole.

Hugh W. Morgan and John E. Winters, Knoxville, Tennessee, for Appellee, FTA Enterprises, Inc.

## OPINION

The plaintiff FTA Enterprises, Inc. ("FTA") sued Pomeroy Computer Resources, Inc. ("Pomeroy"), as well as Daniel K. Cole, ("Cole") a former FTA employee. FTA's action against defendants alleged interference with business relations, interference with contract, breach of fiduciary duty, conversion, conspiracy, unfair competition, etc., and sought compensatory and

punitive damages.

A lengthy trial ensued, and material evidence establishes that FTA, a computer business, purchased offices in Kingsport, Johnson City, and Bristol, Tennessee in 1991-1992 from Computer Choice. Dan Cole was President of Computer Choice. Cole became employed by FTA as Vice-President, and branch manager of the Kingsport branch. For the years 1991 through 1993, Kingsport generated most of FTA's business, and Tennessee Eastman Corporation furnished the Kingsport branch most of its business. The less profitable Johnson City branch was merged with the Kingsport branch at the end of 1993, and after that merger Eastman accounted for approximately two-thirds of the business of the Kingsport branch.

David Pomeroy ("Pomeroy"), President and owner of Pomeroy Computer Resources, approached Richard Eisenbach ("Eisenbach") President of FTA, ostensibly to discuss acquisition of FTA in mid 1993. No agreement was reached, and Pomeroy said at the conclusion of the meeting, that he liked to acquire companies on his own terms, but that he "wasn't adverse to blowing them up."

Then, in February of 1994, Eisenbach contacted Pomeroy to see if he had any interest in buying the FTA branch, but no agreement was reached.

Cole called Eisenbach a few days later and asked him to consider selling to Pomeroy. Eisenbach was then approached by Ed Weinstein from Pomeroy, who offered to buy the Kingsport branch for approximately $700,000, which Eisenbach rejected.

Eisenbach heard nothing further from Pomeroy until he received a call from Cole on March 10, 1994, advising that Cole was resigning immediately to go to work for Pomeroy. When Eisenbach went to the Kingsport office the following morning, he found it "in shambles" with papers strewn everywhere, missing documents, furniture, disks, tools, a paging system, and the hard drives on the computers had been erased. Twenty-nine of the thirty employees at the branch resigned.

Eisenbach then met with Eastman's representatives the following week and obtained copies of FTA's contracts with Eastman, but could not perform services for Eastman because FTA had no employees. Thereafter, FTA was forced to close the Kingsport branch, and sold or returned what inventory they could, and wrote off the rest.

FTA employees were employees at will, and Eisenbach testified that FTA was "shattered" by the loss of thirty-eight employees, but that they still wanted to do business with Eastman later, and could have performed to meet Eastman's needs.

Numerous interrogatories were submitted to the jury, and defendants take issue with most of the jury's answers. The damages awarded to plaintiff are as follows: compensatory damages against Pomeroy in the amount of $560,000.00; compensatory awarded against Cole in the amount of $140,000.00; punitive damages awarded against Pomeroy in the amount of $220,000.00; and

against Cole in the amount of $1.00.

Our review of a jury verdict approved by the Trial Court is whether there is any material evidence to support the verdict. Tenn. R. App. P. 13(d). We are required to take the strongest legitimate view of the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow reasonable inference to sustain it, and discard all countervailing evidence. *Barnes v. Goodyear Tire and Rubber Co.*, 2000 WL 688864 (Tenn. 2000). We do not re-weigh the evidence nor decide where the preponderance of the evidence lies. If the record contains "any material evidence to support the verdict, the Judgment must be upheld. *Also see Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

First, appellants argue there is no material evidence to support the jury's decision that Pomeroy and Cole tortiously interfered with FTA's business, and that Pomeroy and Cole tortiously interfered with FTA's contracts with Eastman.

In order to establish the requisite elements of the tort of interference with a business relationship, plaintiffs must establish the existence of a valid business relation, knowledge of the relationship on the part of the interfering party, and an intentional interference inducing or causing a termination of that relationship and resultant damage to the party whose relationship has been disrupted. *New Life Corp. of America v. Thomas Nelson, Inc.*, 932 S.W.2d 921 (Tenn. Ct. App. 1996). Malice or ill will is also a necessary element of tortious interference with a business relationship. *Lann v. Third Nat. Bank in Nashville*, 198 Tenn. 70, 277 S.W.2d 439, 440 (Tenn. 1955); *Testerman v. Tragesser*, 789 S.W.2d 553, 556-57 (Tenn. Ct. App.1989).

It is beyond dispute that FTA had a current and ongoing relationship with Eastman at the time Pomeroy entered the picture. Cole knew of this relationship, because he worked with Eastman for FTA and the evidence establishes that Pomeroy knew of the relationship. There is no question that FTA was damaged when it lost its business relationship with Eastman, because Eastman accounted for most of the business of FTA's Kingsport branch. The issue thus becomes whether Pomeroy and Cole intentionally interfered with that relationship, and whether the requisite malice or ill will was shown.

Pomeroy officials and Cole admit that they wanted to get Eastman as a customer for Pomeroy, but claim that their motivation was simply normal competition, and that there was no showing of malice or ill will. There was, however, testimony by two individuals not involved in this action, who testified that Pomeroy had told them that his business philosophy was to try and hire key people away from his competitors to get their accounts. One witness testified that Pomeroy told him that he would often enter into negotiations with the company as if he wanted to acquire it so that he could "get under the covers of the business" and find out who their best people were, and then hire those people and walk away from the transaction. He was also quoted as saying that he would hire all of the employees of his competitor "just to get rid of them" and would then fire the employees he didn't really want.

The evidence in this case demonstrates that Pomeroy followed this pattern of conduct. Pomeroy used Cole to find out about the business and who the best employees were, but then offered jobs to all the employees of the Kingsport branch, and hired all except one. Pomeroy also managed to gain the use and control of FTA's paging and email system used with Eastman immediately after FTA's employees went to work for Pomeroy, so that Eastman did not necessarily know that its calls were being answered by Pomeroy employees. The result was that FTA was unable to service the Eastman account, and had to close the branch. Pomeroy then laid off seven of the employees hired from FTA after three months.

As for Cole's interference, he was the most knowledgeable person at FTA regarding the Eastman account, and provided pertinent information regarding that account to Pomeroy's people while he was still working at FTA. Cole, before notifying Eisenbach that he was leaving, held a meeting with all of the FTA employees and told them he was going to work for Pomeroy, and the other employees then followed Cole to Pomeroy's new branch, where Pomeroy offered them employment with Pomeroy, which they accepted. The next day, Cole and Pomeroy's agent met with Cole's contacts at Eastman to solicit their business.

Taking the strongest legitimate view of the evidence favoring the verdict, as we are required to do, there is ample evidence to support the jury's verdict that Pomeroy and Cole tortiously interfered with FTA's business relationship with Eastman. The evidence supports the conclusion that Cole and Pomeroy acted both intentionally and with malice. *See Hayes v. Schweikart's Upholstering Co.*, 402 S.W.2d 472, 479 (Tenn. Ct. App. 1965).

Next, defendant insist that there is no material evidence to support the charge that they interfered with FTA's contracts with Eastman. Many of the elements of this claim overlap with the requirements of tortious interference with a business relationship. Defendants argue that one element of this tort is missing, i.e., there must be a breach of a contract, and rely on *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343 (Tenn. Ct. App. 1999).

The evidence establishes FTA had several existing service contracts with Eastman through December 1994, but these contracts were terminable upon thirty days notice by either party. After the mass exodus from the Kingsport branch, Eisenbach advised Eastman that he had no employees left to provide service for Eastman, and Eastman cancelled in writing and with thirty days' notice in accordance with their terms. The general rule in this regard is set forth in *Winfree v. Educators Credit Union,* 900 S.W.2d 285 (Tenn. Ct. App. 1995), that where a contract is terminable at will, a competitor may legitimately seek termination of that relationship. But as the *Winfree* Court notes, "one who intentionally causes a third party . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other; and (b) the actor does not employ wrongful means" (emphasis supplied); (c) his action does not create a continued and unlawful restraint of trade; and (d) his purpose is at least, in part, to advance his interest in competing with the other." Clearly wrongful means were employed in this case, and the widely followed rule in cases involving interference with at-will contracts is these cases are actionable if

"improper methods" are employed. *See e.g., HIB, Rogal and Hamilton Company of Richmond, et al, v. Depew, et al.,* 440 S.E.2d 918 (Va. 1994). This issue is without merit.

Cole argues that he was not an officer of plaintiff, and did not have an employment contract with a restrictive covenant, and therefore did not breach his fiduciary duty to FTA. He further asserts that the standard is whether he solicited FTA customers before leaving his employment, and relies on *Knott's Wholesale Foods, Inc. v. Azbell*, 1996 WL 697943 (Tenn. Ct. App. Dec. 6, 1996). We do not read *Azbell* to support his position. The *Azbell* Court said:

> After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed.... Even before the termination of the agency, he is entitled to make arrangements to compete, except that he *cannot properly use confidential information peculiar to his employer's business and acquired therein.* Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. He is not, however, entitled to solicit customers for such rival business before the end of his employment *nor can he properly do other similar acts in direct competition with the employer's business.* (Emphasis supplied).

*Azbell, quoting* Restatement (Second) of Agency § 393, cmt. e. The Court also explained:

> During the employment relationship, an employee has a fiduciary duty of loyalty to the employer. The employee must act solely for the benefit of the employer in matters within the scope of his employment. The employee must not engage in conduct that is adverse to the employer's interests.

*Azbell, citing* 27 Am. Jur. 2d Employment Relationship § 216.

Plaintiff's action was not based simply on the direct solicitation of the employer's customers during Cole's employment, although there is evidence that such solicitation occurred. A breach of fiduciary duty may be based upon other conduct in competition with or directly adverse to the employer's interest, if the conduct violates the duty of loyalty to the employer. The evidence demonstrates that Cole breached his duty of loyalty to FTA by giving Pomeroy confidential information regarding FTA's relationship with Eastman which he acquired while working for FTA, so that Pomeroy was able to learn the types of service and products which Eastman expected and then prepare themselves to provide those services. Cole provided FTA's pricing for its purchase orders with Eastman, which enabled Pomeroy to know how to price its products and service when vying for Eastman's business. Cole solicited FTA employees for Pomeroy, and performed other functions to enable Pomeroy to ready its Kingsport branch to serve Eastman, and all of these acts were performed while Cole was employed by FTA. The evidence supports the jury's finding on this issue.

Cole argues that he was not liable for tortiously interfering with FTA's at-will employees, because this cause of action only inures to the benefit of the employee, not the employer. FTA based its claim for interference with its at-will employees on the case of *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994), where the Supreme Court said that "intentional interference with at-will employment by a third party, without privilege or justification, is actionable." The Court explained that this is based upon an individual's "property interest in his labor, and the right to work without unjustified interference." *Id.* quoting *Large v. Dick*, 343 S.W.2d 693 (Tenn. 1960).

Employees in this case were at-will employees and the cases in this jurisdiction which addressed the issue of intentional interference with at-will employment involved employees only because they were terminated, rather than an employer suing because someone "caused" his at-will employees to resign, as in the case here. *See e.g., Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758 (Tenn. 1977); *Baldwin v. Pirelli Armstrong Tire Corp.*, 3 S.W.3d 1 (Tenn. Ct. App. 1999). There are no cases in Tennessee recognizing the employer's cause of action for this tort. However, other jurisdictions which have recognized this tort have either held that it does not inure to the benefit of the employer, or it is simply handled as an interference with business relationships and not as a separate tort. *See GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.,* 99 Cal. Rptr.2d 665 (Cal. Ct. App. 2000); *Burk v. Heritage Food Service, Inc.*, 737 N.E.2d 803 (Ind. Ct. App. 2000); *Setliff v. Atkins*, 616 N.W.2d 878 (S.D. 2000); *Muuray v. SYSCO Corp.*, 273 A.D.2d 760 (N.Y. App. Div. 2000); *Tom's Amusement Co., Inc., v. Total Vending Services,* 533 S.E.2d 413 (Ga. Ct. App. 2000). Thus, we conclude that this tort does not run in favor of the employer. Accordingly, the Judge erred in submitting this issue to the jury. However, we find the error to be harmless in view of all the evidence and the nature of the dispute. Tenn. R. App. P. Rule 36(b).

Pomeroy argues that it cannot be found liable for unfair competition if no underlying tort has been proven, and explains that unfair competition arises when "the defendant engages in any conduct that amounts to a recognized tort, and when the tort deprives the plaintiff of customers or other prospects", *citing Dade International, Inc. v. Iverson*, 9 F. Supp. 2d 858 (M.D. Tenn. 1998). However, the jury found and we affirm that Pomeroy tortiously interfered with FTA's business relationships, and the argument is without merit.

Likewise, Pomeroy and Cole argue that they cannot be held liable for civil conspiracy if the tort claims against them are found to be baseless. This issue is also without merit.

Next, defendants argue that there is no material evidence to support the jury's award of $560,000.00 in compensatory damages against Pomeroy, and $140,000.00 in compensatory damages against Cole.

The proper measure of damages in this case is lost profits, other consequential losses which resulted from the wrongful interference, and emotional distress or actual harm to reputation which result from the interference. *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distributing*, 734 S.W.2d 322 (Tenn. 1987).

The Supreme Court explained:

There may be other losses suffered by plaintiffs directly and proximately resulting from the wrongful interference that should be included within the measure of damages and for that reason, it is neither possible nor appropriate to articulate an inflexible measure of damages for interference with business relationships . . ..

*Id.* at 324. Additionally, the jury found Cole to be liable for breach of fiduciary duty, and found Pomeroy to be liable for inducement of said breach and unfair competition. Moreover, both defendants were found liable for conspiracy. Thus, damages may be awarded for all of the defendants' wrongful actions. FTA's expert testified that the value of the Kingsport branch's income stream was some $2.5 million dollars, but conceded that his value might be drastically reduced if plaintiff lost the Eastman account. Pomeroy's expert opined that the profits from the Kingsport branch were somewhere between $85,000.00 and $110,000.00. Defendants also argue that the jury improperly based damages on defendants' offer to purchase the branch for $700,000.00. This assertion cannot be supported on the record. There is ample financial data in the record from which the jury could derive the amount of damages. The jury could have utilized several amounts from the various income statements of FTA, the reports and calculations of the expert witnesses, or any other financial data contained in the voluminous record to determine the amount of damages. Moreover, jurors are "not required to base damages on a precise mathematical formula, or find in the exact amount of expert opinions, but may take into consideration his ordinary experience as to what damages have been caused to the plaintiff". *Associates Commercial Corp. v. Francisco*, 667 S.W.2d 481, 482 (Tenn. Ct. App. 1983). The amount of damages is supported by material evidence.

Defendants argue that the jury apportioned the compensatory damages award between the defendants, which was inappropriate. Neither party raised this issue in their post-trial motions, and it may not be raised for the first time on appeal. Tenn. R. App. P. 36(a); *Davis v. Tennessee Dept. of Employment Sec.*, 23 S.W.3d 304 (Tenn. Ct. App. 1999).

Finally defendants argue punitive damages were not appropriate. Punitive damages are proper where a defendant has acted intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992). The Supreme Court defined "intentionally" as "when it is the person's conscious objective or desire to engage in the conduct or cause the result", and defined "maliciously" as "when the person is motivated by ill will, hatred, or personal spite." *Id.* at 901. Further, plaintiff must prove such conduct by clear and convincing evidence, since punitive damages are to be awarded in "only the most egregious of cases". *Id.*

We find there is clear and convincing evidence to support the jury's determination that FTA was entitled to punitive damages from both defendants pursuant to the standards set forth in *Hodges*.

The appellee sets forth issues on appeal which we have considered and find to be

without merit.

For the foregoing reasons we affirm the Judgment of the Trial Court and remand, with costs of the appeal assessed to defendants Pomeroy Computer Resources, Inc., and Daniel K. Cole.

_____
HERSCHEL PICKENS FRANKS, J.