## R. H. RIDGES v. L. E. WILLIAMS, Admr.

Eastern Section.   July 9, 1932.

Petition for Certiorari denied by Supreme Court, October 21, 1932.

T. C. Drinnen, of Maryville, for appellant.
Kelly & Kelly, of Knoxville, for appellee.

OWEN, J.   The complainant's bill was dismissed in the lower Court.  He has appealed.  The complainant is a resident of Blount County; the defendant, a resident of Knox County is the Administrator of the estate of L. A. Williams.

The complainant sought to recover from the defendant as administrator $1080 as breach of a contract, made with L. A. Williams, deceased.  The complainant's insistence being that he made a contract with L. A. Williams, deceased, in August, 1929, for twelve months to begin September 19, 1929, and to end September 19, 1930.  It was insisted that the complainant was to move on L. A. Williams' farm in Blount County, live in a house on said farm or a Hotel called the Alleghaney Springs property.  This Hotel consisted of about sixty rooms and was in a mountainous section of Blount County.  The said Williams owned 180 acres of land.  The complainant was to look after said hotel property, and he was to receive his house rent free and $7.50 per month.

It was further insisted that Williams was to pay the complainant $12 per day for three months, and complainant was to furnish himself, his wife, two grown sons and two daughters, or a total of six. And complainant and his family were to operate said hotel, that complainant and his wife were to do the cooking for three months, his daughters to wash dishes, clean up the rooms, and his two sons to work around the hotel, that the hotel was to open July 4, 1930. L. A. Williams died June 18, 1930. His brother qualified as Administrator.

The defendant answered the bill and denied any contract, and also made the following special defense:

"Defendant would further show as a defense that should the Court find that his intestate L. A. Williams and the complainant, R. H. Ridge, did enter into a contract, whereby the said complainant with the several members of his family were to perform work at the Alleghaney Springs Hotel for the summer season of 1930, that such work and labor consisted of cooking, cleaning, waiting on tables, making beds and various other works of personal service; and that such work consisted only of personal service and the contract terminated with the death of defendant's intestate, with the result that the defendant is not bound to perform such contract with the complainant, if any such did exist."

A number of depositions were taken, and the cause was heard of the full record. The Chancellor dismissed complainant's bill, holding that L. A. Williams had contracted for personal services, and that before any said services were performed, L. A. Williams died. Complainant was not entitled to recover of the defendant as Administrator of the estate of L. A. Williams.

Complainant's bill was dismissed. He was taxed with the costs. The complainant excepted, prayed and perfected an appeal, and has assigned three errors as follows:

FIRST: The Honorable Chancellor, erred in holding and decreeing that the contract sued on in this case was for personal services to the said L. A. Williams at his Alleghaney Springs Hotel Property, and that the complainant is not entitled to recover of the said L. E. Williams, Administrator of the estate of L. A. Williams, deceased, on said contract.

SECOND: The Honorable Chancellor committed error in holding in effect that the contract between the complainant, and L. A. Williams, deceased, was a severable contract, and in refusing to render judgment for the complainant for the amount of his loss by reason of the breach of the contract sued on.

THIRD: The learned Chancellor, was in error in dismissing the complainant's bill and in taxing him with the costs of the cause.

It appears that L. A. Williams owned a farm in Blount County, and on this farm was a frame hotel building consisting of about sixty rooms. It was hard to reach on account of bad roads. It was known as Alleghaney Springs Hotel. Williams had owned this property for ten or fifteen years. He had it listed with real estate dealers to sell at the time of Williams' death. He had operated this hotel, about five years prior to his death, for one season, three months, at a loss of several hundred dollars. At that time Williams' wife was living. He was a widower when he made his trade with the complainant.

Complainant's wife and children ranging from 15 to 24 years, it is insisted, were to work at this Hotel during the summer for three months, beginning July 4. Complainant, in his bill, states that the contract was to terminate September 19.

M. L. Ridge, one of the witnesses, testified that he heard the trade between the complainant, witness's father, and the deceased. He testified that his father was working for the Bell Wood dairy farm, that Mr. Williams came to this farm and traded with witness's father.

Q. What was the trade? A. Well, I heard him say that he would give six of us $2 per day and board for three months.

Q. Do you know at that time if he owned the Alleghaney Springs property? A. Yes sir.

Q. After you moved down there did Mr. Williams come to see you? A. Yes sir.

Q. Did he mention the contract? A. Yes sir.

Q. What did he say? A. Well, he wanted us all to understand it. He was to give six of us $2 a day and board and my father $7.50 a month.

Q. When was the springs to open? A. 4th of July.

Q. After July 4th and you found that the Springs was not to be opened did you try to get work? A. Yes sir.

Q. Where did you go? A. To the Sheet Mill, and worked for C. C. Clark.

Q. How long did you work at the Saw Mill? A. Three days.

Q. How must were you paid? A. $5.50.

Q. Did you try to get work other places? A. Yes sir.

Q. What kind of work is there in that section? A. Nothing but farm work.

Q. Were you able to get work on a farm? A. No sir.

The testimony of the other members of the family was practically the same as the witness from whom we have quoted.

It appears that the complainant collected his $7.50 per month regularly after the death of L. A. Williams. The complainant presented a bill for $23.46 for certain work that he had done in the

way of repairing the hotel building. And several months after the death of Mr. Williams, the complainant was at the office of Mr. John M. Kelly of the Knoxville bar, who was representing the Administrator, and who on June 28, 1930, paid the complainant $23.46 for labor making pipe connections and housecleaning at Alleghaney Springs.

On September 15, 1930, the complainant filed with Mr. Kelly, the attorney, a claim on which he is now bringing suit, stating to Mr. Kelly as Mr. Kelly testified as near as he could remember, "You know I had another agreement with Mr. Williams about working at the springs. Mr. Kelly says, that, "This is the first time I learned that he had a contract or claimed to have a contract with L. A. Williams."

No one connected with L. A. Williams' estate had any notice that the complainant was making a claim for services for complainant, his wife and four children, at the rate of $12 per day to begin July 4th, until about the 15th of September. The complainant, from July 4th until September 15th, had been collecting his $7.50 per month which the intestate agreed, and he had also collected the bill for certain work amounting to $23.46, making no mention of any other account.

We find as a fact that the administrator had no knowledge of the intestate's idea or contemplation of operating the hotel during the summer of 1930.

The record shows that the deceased died suddenly on June 18th. He had been in bad health and was complaining mostly from nervousness, that he was contemplating going to a Sanitarium in North Carolina, where he would have had to remain several weeks for treatment.

The complainant testified as follows:

Q. Were you intending to run the Hotel during this season? A. Yes, I intended to work, to run the Hotel and my family was to cook for boarders.

Q. How many of your family did you intend to work there during 1930? A. I intended for six of us to work.

Q. Since you went to Alleghaney Springs property you have been paid $7.50 a month; what is that for? A. To stay there and look after the stock and springs and property.

Q. What were you to have for looking after the Alleghaney Springs property, Mr. Ridge? A. I was to have $7.50 per month and rooms at the Hotel, use of the barn if I needed it and wood, anything that I needed I was to get.

Q. What duties were you to perform under your contract? A. Well, he was to use me and my wife as head cooks, we were to do the cooking, cleaning up the Hotel, keep things straight.

Q. You and your wife were to do the cooking? A. Yes sir, and have help to do part of the cooking.

Q. What were your family to do? A. They were to wash dishes, some make beds and clean house.

Q. What were the boys to do? A. The boys were to work in the Hotel.

The main question determining this law suit is whether or not this is a personal service contract, and if not a personal service contract, the complainant not informing the Administrator of his claim until his contract expired or was about to expire, collecting his $7.50 per month, collecting the $23.46 for labor and work performed, knowing that he was to begin the Hotel work July 4th, and waiting until the 15th of September before he made it known that he had a claim, and put the operation for the season beyond the power of the Administrator to carry out his intestate's contract, is the complainant in a proper attitude to be granted relief in a Court of Equity?

On the question of the liability of an Administrator for the contract of his intestate for personal services, we find the authorities committed to the following doctrines:

"Death of the master with whom a servant has contracted to labor for a specified time dissolves the contract, and the servant cannot recover of the master's estate for services rendered after the death of the master."

3 Williston on Contracts.

"Contracts to perform personal personal services are considered as made on the implied condition that the party shall be alive and be capable of performing the contract so that death or disability will operate as a discharge. The right to regard the contract as discharged by the death of a party is reciprocal, and a party whose personal representative would not be bound to perform in case of his death, cannot, on the death of the other party, charge such party's representative."

13 C. J. (Contracts), 644
Section 719.

"If one man contracts with another to serve him as an overseer for a year, and dies before the expiration of that time his estate is not liable to respond in damages for a failure to serve for the stipulated period."

"A contract to board a person for a specified time is subject to revocation on account of the death of either party.

"And generally, in all contracts for personal services, it is an implied condition that the death of either the employer or employee dissolves the contract."

Elliott on "Contracts,"
Vol. 3, Section 1903.

"By the death of a master, his servant is discharged, and therefore the executors and administrators of the former can bring no action to enforce the contract of service after his death."

Williams on Executors,

Vol. 1, page 626; 21 L. R. A. (N. S.), 916.

The Administrator, in the instant case, could not have maintained an action against the complainant, had Mr. Ridge decided after the death of Mr. Williams that he, Ridge, would not work during the summer months at the Hotel as he had agreed with the deceased. And on the other hand, had the complainant died and L. A. Williams survived, Williams could not have compelled the Administrator of complainant to furnish Mr. Ridge some person to cook, wash dishes, make beds, clean house, etc., at Williams' Hotel.

"In Lacy v. Getman, 119 N. Y., 109, 6 L. R. A., 728, the Court, after showing, by an examination of the authorities, that the accepted doctrine was that the death of a servant dissolved a contract, proceeded thus; 'If that be so, on what principle shall the master be differently and more closely bound? The same reasoning which relieves the servant's estate also relieves the master's, for the relation constituted is personal on both sides and contemplates no substitution. If the master selects the servant, the servant chooses the master. It is not every one to whom he will bind himself for a year, knowing that he must be obedient and render the services required.' ''

"In Yerrington v. Greene, 7 R. I., 589, 84 Am. Dec., 579, it was held that where the contract was to employ the plaintiff as clerk and agent for sale, the continued existence of both parties for the whole stipulated term was the basis upon which the contract proceeded; that, when the employer died, no action lay against his Administrator for refusing to continue with the employment. The Court said: 'This employment could continue no longer than the business in which the employer was engaged and the plaintiff retained. The intestate, when living, could, by the contract, have required the services of the plaintiff in no other business than that in which he had employed him, and with no other person than himself. It would seem, then, necessarily, to follow that when the death of the employer put a stop to this business, and left no legal right over it in the administrators, except to close it up with the least loss to the estate of their decedent, they were by the contract bound no longer to employ the plaintiff, any more than he to serve them. . . . Any other result than that this contract of service was upon the implied condition that the employer, as well as the employed, was to continue to live during the stipulated term of employment, would involve us in the strange conclusion that the Adminis-

trators might go on with the business of their intestate, in which the plaintiff must ''continue with powers unrevoked by the death of his principal.' ''

21 L. R. A. (N. S.), 917-918.

We are of the opinion that there is no error in the decree of the Chancellor in dismissing complainant's bill. That under all the facts in this case and the law applicable thereto, the complainant is not entitled to any relief. The assignments of error are overruled. The judgment of the lower court is affirmed. The complainant will pay all the costs of the cause, for which execution will issue against him; he having executed the oath for poor persons at the commencement of his suit and on his appeal.

Heiskell and Senter, JJ., concur.