INTERNATIONAL HOUSE OF TAL-
ENT, INC., Plaintiff/Appellant,

v.

ALABAMA, a Partnership, and Dale
Morris and Dale Morris and
Associates, Inc., Defendants/Appellees.

Supreme Court of Tennessee,
at Nashville.

May 19, 1986.

Scott F. Siman, Jack Norman, Jr., Nashville, for plaintiff/appellant.

W. Michael Milom, Bob Lynch, Jr., Malcolm M. Mims, Nashville, for Alabama, defendant/appellee.

James H. Harris, III, Nashville, for Dale Morris and Dale Morris & Associates, Inc., defendants/appellees.

## OPINION

HARBISON, Justice.

This suit was filed on October 23, 1981, by the appellant, International House of Talent, Inc., against Alabama, a partnership of popular musicians, and against Dale Morris individually and a corporation which he had formed in June 1981, Dale Morris & Associates, Inc.[1]

The appellant is a talent booking agency in the field of country and popular music. Its suit against Alabama alleged the breach of a written contract dated May 22, 1980, under which International House of Talent, Inc., (herein IHT), was to be the exclusive booking agent for the firm of entertainers for three years, with an option in favor of the agency for a three-year extension.

The suit against Morris was for breach of his fiduciary duty as a director of IHT. Because of an ambiguity as to the identity of the parties in the agency agreement with Alabama, in Count II of the complaint reformation of the agency agreement was sought, if necessary. The complaint alleged that Morris, individually and through his new corporation, had engaged in business with Alabama in violation of IHT's exclusive right to book their personal appearances. An accounting and other relief were sought against Morris and his corporation, together with damages and injunctive relief against the other parties.

On preliminary motion the Chancellor denied injunctive relief against Alabama, holding that the contract between it and IHT was one for personal services and that a court of equity would not enforce specific performance of it.

After trial on the merits, the Chancellor held that Alabama had breached the exclusive booking agreement. He referred the question of damages to a Master. Upon receiving a report he awarded a substantial judgment in favor of IHT, modifying only slightly the award recommended by the

---

1. An additional defendant was Barbara Hardin, who had been employed by International House of Talent, Inc., and later was employed by Dale Morris and his corporation. No relief was granted in the trial court against her, however, nor does the record on appeal support any claim against her.

Master. The Chancellor dismissed the suit as to all other parties.

On appeal, the Court of Appeals held that the exclusive booking agreement was made between Dale Morris individually and Alabama, so that the corporation IHT was not actually a party thereto. The Court did not act on the prayer for reformation contained in the complaint and dismissed the suit against Alabama. It did find, however, that Morris could have breached his fiduciary duty to IHT as a director thereof and that he would be liable unless he could, upon remand, "show facts which would negative such a breach of trust."

■ We granted review to give further consideration to the issues. It has been asserted that since the Court of Appeals apparently did not include Dale Morris & Associates, Inc., as a party on remand, that corporation is no longer a party to the action. This is not correct. Rule 13(a), T.R.A.P., permits any question of law to be brought before this Court for review and relief by any party. It dispenses with the necessity of cross appeals, separate appeals, and separate applications for permission to appeal. We consider that both Morris and his corporation are parties here and that they will continue to be such throughout the remainder of the proceedings in this case.

After careful review of the lengthy record and the comprehensive briefs filed by counsel for the parties, we are of the opinion that the Court of Appeals was in error in holding that the exclusive agency agreement dated May 22, 1980, was not made with IHT as a party, but that it was made personally between Morris and Alabama. In our opinion, however, it was a contract which required the personal services of Morris as advisor, counselor and manager of bookings for Alabama. When he subsequently discontinued booking operations through IHT, the customer, Alabama, was entitled to continue to seek his services and was thereby entitled to sever its relationship with IHT.

Morris was a fifty percent stockholder of IHT and continued to be one of its directors until January 1983, more than a year after the present suit was brought. In our opinion the proof does not show any justification for his engaging in a rival or competitive business with IHT, without first seeking dissolution of that corporation or other appropriate relief. We do not perceive any reason for a new trial as to Morris. Under the evidence both he and the corporation through which he went into competition with IHT must account to the latter for the profits made by them from and after May 28, 1981, through the life of the IHT contract with Alabama.

Upon order of the Chancellor, issues of liability were bifurcated from the reference on damages. Therefore the cause will have to be remanded to the trial court for further consideration of damages. Although counsel for Morris was present during the reference hearings conducted by the Master, Morris was not a party thereto nor was his counsel heard therein. Much of the proof already taken on the reference as to Alabama may be relevant in ascertaining damages against Morris or his corporation, but this is a matter to be determined upon remand.

### A. Factual Background

The country music industry, of which Nashville is one of the major centers, is a volatile business. The story of the rise of the group called "Alabama" from obscurity to national prominence is typical of the industry. It probably exemplifies the dreams and ambitions of the numerous young songwriters, performers and other artists who flock annually to Nashville and to other cities where country and popular music are centered.

The story need not be recounted in detail here. There is no question from the record but that Dale Morris played a significant role in the promotion of Alabama and that those entertainers owe part of their popular and financial success to his skill and direction.

Nevertheless Dale Morris first became established in the music business in association with another entertainer, Billy Wayne

("Crash") Craddock. For several years prior to the date of the exclusive agency agreement involved here, May 22, 1980, Morris had acted as the personal manager of Craddock, a resident of Greensboro, North Carolina, who is a performer of popular music. The types of performances given by Craddock differ from the style of music performed by Alabama. Morris had successfully managed Craddock for several years and received a substantial income annually as his commissions, these being fifteen percent of the gross earnings of Craddock.

A management agreement between the two, dated May 12, 1978, appears in the record. It prohibited Morris from managing any other artist or entertainer during the term of the contract, which commenced June 1, 1978, and ended June 1, 1981. The agreement could be extended only at the option of Craddock.

Morris and Craddock prospered in their relationship. They entered into several independent business ventures. In 1978 as equal partners they established a talent booking agency in Nashville, where Morris resides. In February 1979 they incorporated it. That corporation is the plaintiff/appellant in this case. Morris and Craddock each own fifty percent of the stock. Both were officers and directors from its inception, and they periodically selected other persons to complete its three-member board. Until May 28, 1981, Morris was its president. Neither Morris nor Craddock ever received any salary therefrom. The corporation acted as booking agent for Craddock and was paid a percentage of his earnings for that service, these commissions being independent of those paid to Morris personally as the manager of Craddock.[2]

Morris established headquarters for IHT in Nashville in property jointly owned by him and Craddock. He employed personnel to assist in the booking operations, including Barbara Hardin, who was paid a portion of the booking commissions for her services. Morris supervised the regular affairs of the corporation, insofar as his duties as manager of Craddock would permit. Craddock appears generally to have played a less active role in IHT, although he was both an officer and a member of the board of directors.

This corporation did not have an exclusive written agreement with Craddock, and it was free to book other performers. From time to time it did so. While Morris served as president, from March 1979 until May 28, 1981, several other performers or artists were booked through IHT. Craddock, however, was the most prominent performer booked by the agency. Commissions earned from him represented its principal revenue.

"Alabama" is a group of musicians engaged in the performance of country music. It had its beginnings about 1973. In its early years it had a minimum of professional guidance. It performed at a nightclub in Myrtle Beach, South Carolina, for several years for a modest weekly fee. The group made some recordings, and during the latter part of 1978 or the early part of 1979 it came to the attention of one Larry McBride, the owner of a small recording company. Some of the early Alabama records achieved modest success. The members of the band signed an exclusive management agreement with McBride, and in the spring of 1980 they entered into a recording contract with RCA Records. A Nashville record producer put McBride in contact with Dale Morris in the latter part of 1979 or early 1980.

As a result of this meeting Morris began to book Alabama through the offices of IHT under an oral arrangement which con-

---

2. Throughout the dealings of the parties, the roles of personal manager and booking agent were treated as separate and distinct. While some expert testimony indicated that those roles should not be performed by the same persons, apparently Morris and Craddock had no such impressions, nor did Morris and the members of the group Alabama. If there were any conflicts of interest in Morris' acting as personal manager of Craddock and also serving as president of a corporation which was his booking agent, all parties agreed to and acquiesced in the arrangement. The same is true of the later relationship between Morris and Alabama.

tinued until May 22, 1980. Barbara Hardin did most of the detail work. At this time Alabama was still a relatively unknown group. McBride was inexperienced in the booking phase of the music business. From time to time he undertook to arrange bookings as well as having Morris or Ms. Hardin to do so. Although Morris was having some success in booking Alabama through IHT during the early part of their relationship, he felt that an exclusive booking agreement was necessary to clarify their arrangement and to assure that all bookings would be coordinated through his agency.

B. *The Exclusive Booking Agreement*

The agreement which is the subject of this suit was drafted by an attorney who represented Morris personally. However, his charges for preparing the agreement were billed to and paid by the corporation IHT. Morris testified that the manner of his identification in the contract was specified by McBride, who executed it on behalf of Alabama. There is no question of the authority of McBride to enter into this agreement for Alabama.

The document is entitled "Exclusive Agency Agreement". The first portion thereof is as follows:

"AGREEMENT made this *22nd* day of *May,* 1980 at Nashville, Tennessee, by and between Dale Morris d/b/a International House of Talent (hereinafter referred to as Agent) and The Alabama Band (hereinafter referred to as Artist).

"1. Artist hereby employs Agent and Agent hereby accepts employment as Artist's exclusive booking agent, personal representative, and advisor with respect to Artist's personal appearances and endeavors as a musician and/or vocalist.

"2. The term of this Agreement shall be for an initial period of three (3) years commencing on the date hereof with an option granted by Artist to Agent for a renewal period of three (3) years commencing on the expiration date of the initial period. Agent may exercise this option by giving Artist notice in writing no later than thirty (30) days prior to the expiration of the initial period.

"3. Agent agrees to use all reasonable efforts to procure employment for Artist in any branch of the field of entertainment in which Artist notifies Agent that Artist's services are or will be available. Agent shall have the right to render the same or similar services to other persons either in the capacity in which he is hereby engaged or otherwise. Agent will maintain an office, staff and facilities reasonably adequate for the rendering of such services."

There follow provisions under which the "artist" agreed that it was free to enter into the contract, that it would refer all communications to the agent and would not appear or perform professionally except through the agent.

The agent was to receive a specified fee for services, based upon the consideration paid to the artist. The agent was given the right to negotiate for and agree to terms of employment, to receive and endorse checks and money orders and to disburse funds in payment of necessary expenses.

The latter portion of the agreement is as follows:

"12. This Agreement is one for personal services of each party to the other and shall not be transferable or assignable by operation of law or otherwise without the parties' prior consent.

"13. Artist and Agent acknowledge that they have had preliminary discussions concerning this Agreement and they understand that this Agreement is the only agreement between the parties and that there is no collateral agreement (oral or written) between the parties in any manner relating to the subject matter contained herein. This is the complete and only agreement and cannot be modified or amended except by written instrument signed by both Agent and Artist.

"14. This Agreement shall be deemed to be executed in the State of Tennessee and shall be construed in accordance with the laws of Tennessee. In the event any provision of this agreement shall be

illegal or unenforceable, then, in such event, the same shall not effect (*sic*) the validity of the remaining portions and provisions hereof.

"WHEREFORE, the parties have executed this Agreement on the day and date first written above.

INTERNATIONAL HOUSE OF TALENT   "Alabama"
(Agent)

By /s/ Dale Morris      By /s/ E.L. McBride
   Dale Morris            Artist"

For the next year the personal appearances of Alabama were booked under this arrangement. All booking commissions were paid to the corporation IHT, and it disbursed all incidental expenses. It received escrow funds for Alabama and other artists, and these were held in a corporate account. Apparently there was no question in the minds of any of the parties that the contract was between the corporation IHT and Alabama, although its performance was handled generally under the supervision of the president of the corporation, Dale Morris. Insofar as the practical construction of the contract was concerned, all parties treated it as a corporate contract, not an individual asset held by Dale Morris, either individually or doing business in some separate form.

## C. *Difficulties between Craddock and Morris*

Toward the end of 1980 E.L. McBride, the manager of Alabama, was imprisoned for an alleged fraudulent real estate transaction, unrelated to any of the parties involved in the present case.

The record indicates that the members of Alabama were concerned because their manager had been incarcerated. It was difficult for him to attend to their affairs in that situation. During the early part of 1981 Dale Morris attempted to assist Alabama and a designee of McBride who was temporarily acting as their manager.

During this time the relationship between Morris and Craddock became strained. Near the end of 1980 or in early 1981 Craddock ceased to remit booking commissions to the Nashville office of IHT. He began to deposit them in a separate

IHT account in Greensboro. Morris testified that he had difficulty in contacting Craddock or talking with him, and that he was usually able to reach Craddock only through an intermediary. In February 1981 he made a trip to Greensboro to meet with Craddock to discuss their situation and also to determine whether Craddock intended to renew his management contract with Morris, which expired at the end of May 1981. Craddock testified that at this meeting Morris threatened that if the management agreement were not renewed, he would "take Alabama and walk."

Morris denied making this statement, but he did admit that relationships between the two men were no longer harmonious. Shortly after Morris returned to Nashville, Craddock terminated the power of attorney which Morris held under their management contract, and in April 1981 he notified Morris that the management agreement would not be renewed.

In March 1981 Morris entered into an exclusive arrangement to manage Alabama, and from that time until the trial he served in that capacity. He continued, however, to book both Craddock and Alabama through IHT. There are now no claims of actual misappropriation of funds by Morris through May 28, 1981. Such misappropriation was suggested in correspondence from Craddock to Morris, however, in March 1981.

On or about April 22, 1981, Morris caused two suits to be filed against Craddock in the Chancery Court at Nashville. One of these was brought on behalf of the corporation, asserting that Craddock had failed to pay booking fees to the company. This suit was later dismissed on the ground that Morris had no authority from the corporation to maintain it.

The other suit charged Craddock with failure to pay management fees to Morris. Craddock counterclaimed for damages. Inasmuch as Morris became the manager of Alabama in March 1981, in violation of his exclusive arrangement with Craddock, the trial judge held that the damages sustained

by Craddock were at least equal to the management fees withheld. No award was made to either party at a trial held in 1982.[3] The filing of these two actions in April 1981, at a minimum, was not calculated to conciliate Craddock, upon whom Morris had previously been largely dependent, or to ease the tension in their relationship.

In a letter dated April 24, 1981, Craddock demanded to see the books and records of IHT. Early in May Morris caused substantial funds to be drawn out of a corporate escrow account and placed in a special account on which only he could draw. Checks were written on this account to pay artists and to defray expenses incidental to their booking.

### D. Subsequent Events

Because of these developments Craddock caused notice to be given of a special meeting of the board of directors of IHT in Nashville on May 28, 1981. Morris admitted receiving notice of the meeting but he did not attend. His reasons for not doing so were contradictory. He was rather severely impeached on cross-examination. In all events, he was not present. As the meeting was ending his attorney appeared and gave handwritten notice of a called meeting of the stockholders of the corporation to be held on June 4, 1981 "for the purpose of electing directors and officers of the corporation." The meeting was called "by Dale C. Morris, owner of fifty per cent of the outstanding shares." For reasons unexplained in the record, this meeting was never held.

At the directors' meeting new officers were elected, Morris being replaced by Craddock as president of IHT. Morris was not elected to any office. His authority to write checks on the corporate accounts was terminated. He remained a member of the board of directors and a fifty percent stockholder in the company. Because of his

having withdrawn corporate escrow funds and having placed them in an account to which only he had access, without consultation with Craddock or the other director, Craddock and his attorneys demanded to see the books and records of the corporation. They went to the corporate offices and physically took charge of checkbooks and other financial records. A short time later, by agreement of all the parties, Morris arranged to transfer to his attorney most of the funds which he had placed in a special account, and there is no claim as to any misapplication of any of these funds.

Morris was told by some employees at the office that he was "out" of the corporation and had nothing further to do with it. He was not told this by Craddock or any other officer or director, insofar as the record reveals. He nevertheless concluded that he had been "ousted" and "stripped of authority," and a few days later he so advised the members of Alabama.

This is perhaps one of the most important points in the litigation. The Court of Appeals concluded that the board of directors of IHT "discharged Dale Morris terminating his employment with the corporation."

While this is the insistence of Morris, we do not find it to be borne out by the record. It will be remembered that Morris was not on a salary, nor was Craddock. Their duties and responsibilities with IHT were part-time only. The two men had formed the venture as a sideline for the channeling of booking commissions. Apparently any compensation which either of them was to receive from it was to be by way of corporate dividends.

Morris was removed as president, and he was, at least until the financial condition of the company could be ascertained, prevented from writing further checks. In no

---

**3.** The Chancellor in the Morris-Craddock suit found the following:

"On February 26, 1981, the parties met in Greensboro, North Carolina to discuss their further arrangements. The meeting concluded by Morris saying he was going to devote his time to managing Alabama.

"Morris returned to Nashville and withdrew the Alabama group from IHT and began managing and booking them personally.

"Alabama has since experienced phenomenal success. They have sold over 4 million albums and have gone from $1,500 up to $125,000 a night for personal appearances."

other sense, however, was he terminated or "ousted." He remained on the board of directors, and he has continued throughout to own his stock in the venture.

Although Morris was apparently advised by counsel throughout the course of these events, he made no effort to have the corporation dissolved on the ground of a deadlock between equal stockholders, or because of any sort of corporate abuse by Craddock and the other officers, as authorized by Tennessee law. He did not confer with the other directors or seek any other sort of relief. Instead he seems to have formed in his own mind the conclusion that all of his relationships with IHT had been severed, so that he was free to leave that corporation and to enter into competition with it.

Whether or not Morris told Craddock that he planned "to take Alabama and walk" when the two met in February 1981, this is precisely what he did a little over three months later, in June 1981.

Morris testified that without the books and records of IHT it would have been impossible for him to continue to conduct a booking operation through IHT. Nevertheless he immediately began booking on his own, and in early June he booked a performance by Alabama. He continued to do so on an expanding basis throughout the remainder of the year. His testimony that he could no longer have booked through IHT after May 28 is not convincing.

When Morris advised the members of Alabama that he was no longer with IHT, he testified that they immediately told him that they wished thereafter to book through a new agency which he was forming. Even though he was at that time the personal manager of Alabama, he also became their exclusive booking agent and remained so at the time of the trial in 1983.

IHT conducted no further booking operations on behalf of Alabama after May 28, 1981. It did attempt to locate all of the records concerning bookings, and there is correspondence in the file dated June 16, where it demanded these from Morris and others, including Ms. Hardin who immedi-

ately went to work for Morris. Not until August 11 did IHT or any representative thereof contact Alabama to suggest that IHT would continue to perform booking functions for that group. At that time IHT was advised by an attorney for Alabama that the latter did not consider the exclusive agency agreement to be a binding contract with the corporation, insisting that it was only a contract with Dale Morris.

The record is clear that the booking for performers such as Alabama is essential to their success. It is also clear that if someone had not conducted bookings for Alabama during June, July and August 1981, the career of the group could have been seriously affected. Whatever the reason, IHT did not perform those essential services during that period of time.

Under the guidance of Morris as both their manager and booking agent, Alabama began to enjoy spectacular success. During the latter part of 1981 it achieved recognition at an awards ceremony for country musicians. During 1982 it obtained a most profitable contract with the Reynolds Tobacco Company. This was renewed in 1983. During those two years the earnings of the group rose into the millions of dollars. The band became and has remained one of the most popular and highly paid performing groups of its type, both from the standpoint of personal appearances and from that of sales of recordings.

IHT makes no claim to any of the personal commissions earned by Morris as manager of Alabama. It does insist that it is entitled to an accounting from Morris for his profits in booking Alabama from and after May 28, 1981. All commissions due to IHT prior to that date have been paid. IHT has continued to operate as a booking agent for Craddock and for some other performers, and presumably those commissions have gone into its corporate accounts.

During the reference, the Master found that IHT could have continued successfully to book Alabama and to provide proper and adequate services in that regard to that group. The Chancellor concurred in that

finding. Regardless of that, however, there is no question in the record but that had Morris continued to remain with IHT and to book through its facilities, the booking commissions would have been paid to the corporation.

After the present suit was brought in October 1981, Morris agreed to indemnify Alabama for any booking commissions which might be due to IHT under the 1980 contract. Most of the booking fees thereafter were held in escrow by Alabama, and subsequently nearly one million dollars in cash was paid into the registry of the Chancery Court where it remains. It is our understanding that Alabama makes no claim to any of these funds.

Essentially the litigation, stripped of all formalities, is between IHT and Morris. The issue is whether Morris can retain for himself and his corporation all of the booking fees which might have been due to IHT under the 1980 contract, or whether those fees must be paid into the corporate account of IHT and ultimately inure to the benefit of its stockholders, Morris and Craddock, in equal shares.

### E. *Our Conclusions*

As previously stated, the Court of Appeals concluded that the contract as drawn was a personal agreement between Morris individually and the band called "Alabama." It held that parol evidence was not admissible to vary the terms of that contract, and that since the contract was not made in the corporate name or in corporate form, IHT was not a party thereto and could not assert a claim for breach against Alabama. It did conclude, however, that as between Morris and IHT, the latter was the "equitable owner" of the contract as a corporate asset and that Morris was not free to disregard his fiduciary obligations to IHT.

The testimony by all of the parties was that the contract was with the corporation IHT and not with Dale Morris individually. Even though its form was ambiguous, and even though the name of the corporation as such did not ever appear therein, it was executed between Alabama and "Dale Morris d/b/a International House of Talent." It was signed on behalf of the agency "International House of Talent by Dale Morris."

Dale Morris was not then or ever engaged in business as a proprietorship or under the trade name "International House of Talent." He was president of a corporation known as International House of Talent, Inc., was a director thereof and was owner of one-half of the outstanding stock. The fact that he was a corporate official and was affiliated with the corporation was known to McBride, the manager of Alabama. For over a year after the contract was written, all parties knew that receipts went to this corporation and that all expenses were disbursed out of it. Everyone connected with the case testified that the contract was between the corporation and Alabama, not between Morris individually and the group of which McBride was then the personal manager.

It is obvious from reading the contract that it was ambiguous. The practical construction given by the parties was to treat it as an asset of the corporation, and this was the intent of everyone connected with it. We therefore are of the opinion that the Court of Appeals was in error in concluding that it was a personal contract with Morris and in holding that parol evidence was not admissible to clarify the ambiguity in the written instrument.

■ Parol evidence is ordinarily admissible to establish the identities of the parties to a contract or other legal instrument. *See Holmes v. Jarrett Moon & Company,* 54 Tenn. 506 (1872); *Acme Metals, Inc. v. Weddington,* 575 S.W.2d 15 (Tenn.App. 1978); Annot. 80 A.L.R.2d 1137 (1961). We recognize that in the case of *Lazarov v. Klyce,* 195 Tenn. 27, 255 S.W.2d 11 (1953), this Court held that parol evidence would not be admitted to show that an individual signed a note as a corporate official. That case, however, involved a negotiable instrument. The result was largely controlled by statute. Further, the individual signature did not purport to be by or on behalf of

anyone other than the person signing the document, whereas here it is clear that Dale Morris executed the exclusive agency contract in some sort of representative capacity.

■ This case does not involve the Uniform Commercial Code or a negotiable instrument. We are of the opinion that parol evidence to show the true identity of the parties was admissible. *See Anderson v. Sharp*, 195 Tenn. 274, 259 S.W.2d 521 (1953). In that case the Court held that parol evidence was admissible to show that several individuals had signed an agreement as representatives of an organization and that they had not bound themselves personally. The Court said:

"The question stated is close, and at first blush seems to come within the rules and principle stated in a recent case of *Lazarov v. Klyce*, Tenn.Sup., 255 S.W.(2d) 11, except that the instrument involved in that case was negotiable.

"The point to be determined here is whether the instrument is ambiguous so as to let in parol evidence....

"In view of the two items mentioned, we think it can be fairly said that the instrument sued upon is ambiguous upon its face as to whether Sharp and Scott bound themselves personally to pay this bill. That being true, under all the authorities parol evidence was admissible to explain the actual agreement." 195 Tenn. at 278–79, 259 S.W.2d at 522–23.

■ As previously stated, the parties operated under this agreement for more than a year, treating it in all respects as having been made with the corporation, not with Morris personally. The rule of practical construction "is that the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered." *Hamblen County v. City of Morristown, Tennessee*, 656 S.W.2d 331, 335 (Tenn.1983).

The almost unanimous evidence in the present case, certainly the overwhelming preponderance, is to the effect that the corporation IHT was the intended party to this contract as the agent, and the conclusion of the Chancellor to that effect is affirmed.

■ Nevertheless, although the Chancellor had correctly held that the contract was one calling for the personal services of Alabama, he held that it was not a contract for the personal services of Dale Morris. It was his conclusion that the members of Alabama and their then manager, McBride, simply wanted a competent booking service, and that there was nothing unique or personal about the services of Dale Morris.

The contract itself provides otherwise. Under its terms the agent was not only to provide booking services, but was to act as the "personal representative, and advisor" with respect to the personal appearances and endeavors of the artist group. Further, in paragraph 12 it is expressly stated:

"This Agreement is one for personal services of each party to the other and shall not be transferable or assignable by operation of law or otherwise without the parties' prior consent."

The Chancellor interpreted this merely as a prohibition against the assignment of any contractual obligations. It is clear from the evidence, however, that Morris, who was already advising Alabama in May, 1980, was indeed their personal counselor and that he capably and carefully directed their career. The record shows that the services of a booking agent are essential to the success of a performer, and Morris skillfully arranged for profitable engagements of this group, bringing them from relative obscurity to great national popularity. Although McBride knew that Morris was affiliated with a corporation when he executed the May 22, 1980 agreement for Alabama, he made clear that the services of Morris were being contracted for and that the contract would not have been entered into without their being available. The personal skill and ability of Morris were indispensable insofar as Alabama was concerned.

■ Although the contract did not contain a "key man" clause, expressly authorizing its termination by the artist group upon the unavailability of the personal services of Morris, we are of the opinion that such a condition was clearly implied from the relationship of the parties and from their testimony in this case. *See generally Restatement of Contracts Second* § 262, Comment *b.* (1981).[4]

When IHT either did not or could not continue to make the services of Morris available to Alabama from and after May 23, 1981, and when it itself did not provide similar services for two and one-half months, we are of the opinion that Alabama was justified in continuing to seek the services of Morris outside the facilities and other personnel of IHT. Accordingly we are of the opinion that Alabama, as a corporate customer, in no way responsible for the disputes between Morris and Craddock, was justified in terminating its relationship with IHT under all of the circumstances and that it is not liable to that corporation for the damages claimed in this case. Although for different reasons, we reach the same result as the Court of Appeals and affirm its decision with respect to the claim of appellant against Alabama.

With respect to Morris, however, a different situation is presented. For whatever reason, he remained on the board of directors of IHT from and after May 28, 1981 until January 24, 1983. He made no effort to resign or disengage himself from that position. He did resign in 1983, but this matter was already in litigation by then. By that time, also, he had already formed a rival, competing agency. He had taken Alabama and "walked," along with at least two other artists previously booked through IHT.[5]

It has long been the rule in this state that where there is severe dissension between equal shareholders of a corporation, dissolution or other appropriate relief may be sought in a court of equity. *See Nashville Packet Co. v. Neville,* 144 Tenn. 698, 235 S.W. 64 (1921). Statutes in force since at least 1968 have confirmed the jurisdiction of a court of equity to liquidate and dissolve corporations in suits by directors or shareholders when it is established that the petitioner has exhausted all reasonable procedures available to him to redress grievances within the corporation and that:

"(A) The directors are deadlocked in the management of corporate affairs and irreparable injury to the corporation is being suffered or is threatened by reason thereof, and either that the shareholders or members are unable to break the deadlock, or, if a corporation not for profit, that there are no members having voting power;

"(B) The shareholders or members entitled to vote in the election of directors are deadlocked in voting power and have failed for at least two (2) years to elect successors to directors whose terms have expired or would have expired upon the election of their successors;

"(C) The acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or the corporate assets are being misapplied or wasted;

"(D) If a corporation for profit, there is internal dissension and two (2) or more factions of shareholders are so divided that dissolution would be beneficial to the shareholders; or the corporation has substantially ceased to do business, and the majority of the shareholders are withholding from a minority of the shareholders their rightful share of corporate

---

**4.** When a contract calls for personal services, there is an implied condition that the person shall be able at the time appointed to render these. Otherwise either party may terminate the agreement. *See generally Rodgers v. Southern Newspapers, Inc.,* 214 Tenn. 335, 379 S.W.2d 797 (1964); *Greenwood v. National Biscuit Co.,* 175 Tenn. 302, 134 S.W.2d 149 (1939); *Ridges v. Williams,* 15 Tenn.App. 197 (1932). *Cf. Nance,*

*Inc., v. Winebarger, Inc.,* 32 Tenn.App. 229, 222 S.W.2d 231 (1949) (intent to deal with customer only in individual capacity, not as agent of competitor).

**5.** These artists had no exclusive agreement either with Morris or with IHT, and no claim is made for loss of profits with respect to them.

assets to which they would be entitled upon dissolution by failing or refusing to vote their shares in favor of dissolution without a valid business reason for such failure or refusal...." T.C.A. § 48–1–1008(a)(1).

It is argued on behalf of Morris that after May 28, 1981, he no longer held an office in the corporation known as IHT, and that Craddock controlled two of the three votes on the Board of Directors. It is insisted by Morris that he lacked sufficient voting power to change that situation, and that since his check-writing authority had also been terminated, he was entitled, even though still a director, to separate himself entirely from the affairs of the corporation and immediately begin the operation of a competing enterprise, seeking to take from the corporation valuable and profitable customers.

■ We do not agree with this position either factually or legally. There is nothing in the record to indicate that Craddock or any other corporate officer instructed Morris to cease booking Alabama or any other clients of the firm. There is nothing to indicate that anyone attempted to sever any connection he had with the corporation, except as its president. He had not shown the books and records of the corporation to Craddock or his attorney, nor had he consulted with them or advised them about bringing two suits against Craddock or about withdrawing some $20,000 from corporate escrow funds and placing them in an account accessible only to him. In our opinion Craddock and his attorneys were justified in demanding to see the books and records and in taking possession of them, at least temporarily until they could ascertain the status of the corporate affairs which had previously been supervised by Morris alone.

■ If the two equal stockholders were unable to resolve their internal dissension, the corporate laws of the state gave Morris ample authority to file a suit for dissolution or other appropriate relief. He was not, in our opinion, entitled to remain on the board of directors of the corporation and to con-

trol one-half of its stock, and then set out deliberately to take its contracts and customers, stripping it of the revenues to be derived therefrom.

Unlike the Court of Appeals, we see no need for the granting of a further trial as to the liability of Morris. The proof has been fully developed at a lengthy trial. In our opinion it is clear that Morris must account to IHT for the net profits which he or the corporation formed by him received from the booking of Alabama through the remainder of the IHT contract with that group. For cases dealing with the fiduciary duty of a director to a corporation see generally *State ex rel. Oliver v. The Society for the Preservation of the Book of Common Prayer*, 693 S.W.2d 340 (Tenn. 1985); *Neese v. Brown*, 218 Tenn. 686, 405 S.W.2d 577 (1964); *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344 (1948); *Steward Mfg. Co. v. Steward*, 109 Tenn. 288, 70 S.W. 808 (1902); *Hayes v. Schweikart's Upholstering Co.*, 55 Tenn. App. 442, 402 S.W.2d 472 (1965).

It is true, as found by the Chancellor, that Morris did not have any written restrictive agreement or non-compete arrangement with IHT. It is also true, however, that neither he nor Craddock was drawing a salary from the company, nor was either financially dependent upon it. They had previously formed the booking agency as a partnership, and when it was incorporated they each held equal ownership of the outstanding shares of stock. Morris at no time ever relinquished his financial interest in IHT, and he made no effort to resign from its board of directors until he had already effectively stripped the corporation of what would undoubtedly have been its most profitable customer. His remaining as a director was a sufficient legal restraint against competition under the facts shown here.

The judgment of the Court of Appeals with respect to Morris and his corporation is modified so as to require them to account to IHT for all net profits received by them, or either of them, from the booking of Alabama after May 28, 1981. The cause

will be remanded to the Chancellor to determine those profits either directly or through a reference, as he finds proper. The funds previously deposited into court by Alabama in lieu of an appeal bond will remain in the custody of the Clerk and Master pending further orders of the Chancellor. After the accounting the funds will be disbursed in the manner deemed most appropriate by the Chancellor. It may be that the stockholders by amended pleadings will prefer the dissolution of IHT and a final accounting of all of its affairs if they cannot otherwise resolve their disagreements.

Costs incident to the appeal are taxed to Morris. All other costs will be fixed by the Chancellor.

BROCK, C.J., and FONES, COOPER and DROWOTA, JJ., concur.