IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 5, 2009 Session

## JOY LAMBERSON MCNAUGHTEN, ET AL. V. LARRY LUNAN, ET AL.

Appeal from the Circuit Court for Sumner County
No. 27878    C. L. Rogers, Judge

No. M2008-00806-COA-R3-CV - Filed May 14, 2010

The owners of a piece of commercial property brought an unlawful detainer action against a lessee who had stopped paying rent. The trial court issued a judgment of $33,450 against the lessee for past-due rent, followed by a writ of ejectment. After the lessee moved from the property, the owners sued to collect the rent due on the five-year lease and for damages to the property. The lessee argued that irregularities in the execution of the lease rendered it unenforceable. The trial court determined that the lease was enforceable and that the lessee could be held personally liable for a judgment in the amount of $326,716.74. We find that the parties did not reach the meeting of the minds that is necessary to form an enforceable contract, and we accordingly reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

PATRICIA J. COTTRELL, P.J.,M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Byron M. Gill, Lebanon, Tennessee, for the appellants, Larry Lunan, Bad Toys, Inc., and Gambler, Inc.

Steven F. Glaser, Gallatin, Tennessee, for the appellees, Joy Lamberson McNaughten and Allen Wilson.

### OPINION

#### I. BACKGROUND

The case involves a purported lease of commercial property located at 128 Volunteer Boulevard in Hendersonville, Tennessee. Prior to the execution of the lease at issue, the

property was owned by C.K. Spurlock and most of it was occupied by his custom motorcycle business, Gambler Motorcycles, Inc. ("Gambler"). The premises included a parking lot, a large building containing a sales showroom and a number of offices, and a second building which housed a machine shop. At the time of the execution of the lease contract at issue, some of the office space was leased and occupied by a third-party tenant.

Defendant Larry Lunan ("Lunan"), a Kingsport resident, was the majority owner and the operator of several motorcycle-related companies, including defendant Bad Toys, Inc. He wished to expand by acquiring other businesses of the same type. In the fall of 2003, he came to Nashville and took a tour of Gambler's facilities. He then began negotiations with Mr. Spurlock to buy all the assets of his company, including the real estate, the equipment and tools located on the premises, and the right to use the Gambler name.

Mr. Lunan was unable to secure adequate financing for the entire purchase he had planned, so Mr. Spurlock entered into a contract to sell the underlying real property to the plaintiff real estate investors, Joyce Lamberson-McNaughten and Alan Wilson. Lunan continued to negotiate with Spurlock for the rest of Gambler's assets. According to Lunan, Spurlock advised him that Bad Toys would benefit by keeping the business in its current location. Lunan was also told that if he did not execute a lease for the property, it would be leased to a third party, forcing Bad Toys to relocate immediately after purchasing Gambler's assets.

Plaintiff McNaughten testified at trial that the investors wanted a signed lease because they had not yet closed on their contract to purchase the property and they would not be able to obtain the necessary financing until they could show the bank that they had a lease in place. Defendant Lunan testified that he agreed to execute a lease only after receiving assurances from Spurlock and McNaughten[1] that if the transaction between Bad Toys and Gambler was not finalized, the lease would be considered null and void. Ms. McNaughten acknowledged at trial that she had indeed made those assurances.

The circumstances surrounding the actual execution of the resulting lease were unusual, and the document itself was rife with inconsistencies. The investors sent a four page "standard" lease contract in blank to Mr. Spurlock, who filled in the specific terms and forwarded the document by fax to Lunan for his signature. The contract recited that it was "made this 12th day of November 2004 between 128 Volunteer Properties hereinafter called 'Lessor' and Larry Lunan hereinafter called 'Lessee.'" The plaintiffs later admitted that there was no such entity as 128 Volunteer Properties, but they argued that the parties

---

[1] The proof shows that Ms. McNaughten and Mr. Lunan did not meet in person until after the lawsuit was filed, but that they spoke by phone before Mr. Lunan signed the lease.

understood that the lease was actually between Lunan and Spurlock, and that when the plaintiffs subsequently purchased the property, they became Spurlock's successors-in-interest.

The lease specified a duration of five years, with rent of $5,770 payable each month, increasing over the term of the agreement to $6,429 per month in the final year. One clause required the lessee to pay reasonable attorney fees and all costs if the lessor should need the services of an attorney to collect any of the rent or to otherwise enforce any provisions of the lease because of default by the lessee. Another clause provided stiff financial penalties for late payment of rent.[2] Although Mr. Lunan had access to an attorney and an accountant, he did not consult them before he signed the lease and faxed the signed copy to the plaintiffs.

Two blank signature lines were placed at the bottom of the final page. Lunan signed both of them. The first line, labeled "LESSOR" was signed "Bad Toys, Inc. - Gambler, Inc." The second line, beneath it, labeled "GUARANTOR," was signed "Larry N. Lunan President." There was no clause in the body of the lease setting out any obligations or duties to be assumed by a guarantor. According to Mr. Lunan, he signed the lease as an accommodation to the plaintiffs, and they promised him that if necessary it could be reformed at a later date. He also testified that the plaintiffs had led him to believe that they had already closed on the property when he signed the lease. However, the proof showed that they had not. The sale was completed on November 29, 2004.

After Mr. Lunan completed his purchase of Gambler, he paid his first and last months rent to the plaintiffs ($12,199) on December 8, 2004, and subsequently took over the operations of the business. The check was drawn on the account of Bad Toys, Inc., and was made out to 128 Volunteer Properties. Most of the subsequent rental checks were drawn on the account of Gambler Motorcycle Company, Inc. and were made out to Brokers Headquarters Group, the actual name of the plaintiffs' company.

Mr. Lunan subsequently became dissatisfied with the rental arrangement. He complained, among other things, that the penalties for late payment of rent were excessive, and that the plaintiffs were unwilling to work with him to reform the lease. He also wrote to the plaintiffs to report multiple leaks in the roof of the main building. He testified that

---

[2]The agreement requires each installment of rent to be paid in advance on the first day of the month. Further "[l]essee agrees any rent installment or any other payment due under the terms and conditions of this lease contract, that is not paid within ten (10) days of the due date, shall be assessed an additional charge of 5% of the amount past due. For each day after the 10th day, said late charge shall also include an additional charge of 1% of the monthly rental installment or payment due for each additional day that said rental installment or payment is past due."

they did not respond to the letter and that they took no action to repair the roof, even though the lease allocated responsibility to the lessors for keeping the roof in good order. After sending a final check to "Broker Headquarters" on September 12, 2005, Mr. Lunan stopped paying rent.

## II. COURT PROCEEDINGS

On November 7, 2005, Ms. McNaughten and Mr. Wilson filed a detainer warrant in the General Sessions Court of Sumner County against Larry Lunan, alleging that he had breached the lease by failing to pay rent. Mr. Lunan allowed a default judgment to be entered against him for $33,449 in past due rent. He appealed the judgment to the Circuit Court of Sumner County on December 19, 2005. The plaintiffs filed a motion in the circuit court for a writ of ejectment. Lunan was unable to post a bond sufficiently large to avoid ejectment, and he was ordered to leave the premises by February 15, 2006.

The pleadings in the record named Larry Lunan as a defendant in his individual capacity. They included claims against him for damage to the property and for the cost of cleaning up after his departure.[3] On October 26, 2007, Mr. Lunan filed a motion for summary judgment in which he argued that there was no proof that he had acted "as anything other than an officer of and on behalf of Defendant, Bad Toys, Inc," and therefore that he should not be held personally liable on the lease.

The trial court conducted a trial of the case over two days. The plaintiffs presented their case-in-chief on November 29, 2007. The testifying witnesses were Ms. McNaughten and Todd Robertson, an electrician whom the plaintiffs hired to reinstall some compressors that Lunan had first removed when he vacated the building and then brought back. McNaughten testified that Lunan told her that he would personally guarantee the lease contract. She was questioned about the meaning of a guaranty, and her responses led the trial judge to state, "I'm not fully comfortable she understands that word." McNaughten also testified that it cost the plaintiffs $2,500 to have trash hauled off from the property after it was vacated. The parties stipulated that the cost of electrical repair and replacement of compressor lines amounted to $8,900. At the end of the first day's proof, Lunan asked that he be dismissed individually. The court denied the motion.

---

[3]The record on appeal does not contain an initial complaint in Circuit Court. It does contain a " First Amended Complaint, which was filed October 28, 2007 (the day before trial). It names Joyce Lamberson McNaughten and Alan Wilson as plaintiffs and Larry Lunan d/b/a Bad Toys, Inc. as the defendant.

The hearing resumed on Feb 14, 2008. In addition to Mr. Lunan, the defense called the chief financial officer of Bad Toys, Inc. and the company bookkeeper.[4] As we noted above, Lunan testified that at the time he signed the lease, McNaughten told him that the lease terms could be modified if necessary. In her testimony, McNaughten had denied making any such assurances.

In announcing its decision from the bench, the court noted that there were many errors in the document in question, but decided nonetheless that it was a valid and enforceable five-year lease. The court declared that it could not believe that the plaintiffs would have agreed to allow the defendants to walk away from the five year term of the lease because they relied on the prompt payment of rent so they could pay their mortgage, and because paragraph 12 of the contract declares that the lessor may terminate the lease upon the failure of the lessee to cure any default because "[l]essee understands that the building is the subject of long term mortgage financing based upon expected rent flow and that uninterrupted payment of rents by tenants is of prime importance."

The court went on to cite the designation of the parties in the first paragraph of the contract and to identify the lessor as 128 Volunteer Properties and the lessee as Larry Lunan. The court accordingly declared that Mr. Lunan had signed the lease in his individual capacity and was also its guarantor and, thus, that he was personally liable for the total amount of rent incurred under the lease up until the day of trial, as well as damages for clean-up and repairs, and the attorney fees incurred in enforcing the lease.[5]

The court's decision was memorialized in its final order, dated March 17, 2008, which assessed the defendants' obligations under the lease in accordance with calculations made by the plaintiffs' attorney. The total amount awarded was $342,419.99, which included $8,900 and $2,500 for repairs and clean-up respectively, and attorney fees of $24,030. The defendants filed a motion to alter or amend the judgment. The court agreed with the defendants that it was appropriate to modify the rental portion of the judgment by reducing

---

[4]Neither party called Mr. Spurlock as a witness, although it seems likely that his testimony would have helped the trial court to better understand the circumstances that led to the execution of the lease. Since it is not clear whether his testimony would have favored one side or the other, neither party was entitled to draw any adverse inferences from his failure to testify under the "missing witness rule." *See In re Estate of Nichols,* 856 S.W.2d 397, 402 (Tenn. 1993).

[5]The court also found that the penalties set out in the lease for late payment were unreasonable and impossible to calculate under the circumstances. The court accordingly decided not to include any penalties in its judgment, but it did impose prejudgment interest at a rate of eight and a half percent per annum, beginning from October of 2005.

it to present value. The amended final order, filed on May 28, 2008, reduced the total judgment to $326,716.74. This appeal followed.

## III. ANALYSIS

### A. DID THE PARTIES ENTER INTO A BINDING CONTRACT?

Since this case was tried without a jury, this court reviews findings of fact *de novo* on the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). Questions of law are also reviewed *de novo,* but with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

The central question in this case is the legal effect of a written contract, which is a question of law. *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d at 191, 196 (Tenn. 2001); *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn.1999). Therefore, the trial court's conclusions about contract formation and its interpretation of the contract are not afforded a presumption of correctness. *See Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000); *In re Estate of Nelson*, No. W2006-00030-COA-R3-CV, 2007 WL 851265 at *7 (Tenn. Ct. App. March 22, 2007) (no Tenn. R. App. P. 11 application filed).

The basic question for this court to consider is whether the lease itself constitutes a binding and enforceable contract. A fundamental requirement for any kind of valid contract is mutual assent to the terms of the agreement. *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984); *Forest Inc. v. Guaranty Mortgage Co.*, 534 S.W.2d 853, 857 (Tenn. Ct. App. 1975). That requirement is often described as a meeting of the minds of the parties. *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d at 196; *Wills & Wills, L.P. v. Gill*, 54 S.W.3d 283, 286 (Tenn. Ct. App. 2001).

Indefiniteness regarding an essential element of a contract may prevent the creation of an enforceable contract. *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d at 196 (Tenn. 2001); *Strickland v. Cartwright*, 117 S.W.3d 766, 772 (Tenn. Ct. App. 2003). To constitute a valid contract, the minds of the parties must have met on the terms of the contract and the identity of the persons with whom they are dealing. *See Ludwinska v. John Hancock Mut. Life Ins. Co.*, 178 A. 28, 30 (Pa. 1935); AM.JUR. 2d *Contracts* § 70. Parol evidence is admissible to establish the identities of the parties to a contract or other legal instrument. *International House of Talent v. Alabama*, 712 S.W.2d 78, 86 (Tenn. 1986). However, the manner in which the contract before us was executed shows that the parties themselves were

somewhat uncertain as to which individuals or entities they intended should be bound by it.

The trial court stated that it "easily" found that "[t]he lessor was this 128 Volunteer Properties." It is undisputed that no such entity exists. The use of that name in the contract, is not, in and of itself, necessarily fatal to the contract. *See Burks v. Belz-Wilson Properties*, 958 S.W.2d 773, 776 (Tenn. Ct. App. 1997) ("While an entity doing business under a trade name does not have a legal existence and is not capable of being sued, we believe that a business operating as a trade name can validly execute a contract."). But it does bring into question whether the defendants actually knew with whom they were dealing. Additionally, the nonexistence of the entity named as lessor reduces the lessee's ability to sue to enforce the agreement. There is no reason to believe that either party intended to enter into an unenforceable agreement.

The trial court found that the lessee was Larry Lunan, on the sole basis of that designation in the first sentence of the contract. But there was no place in the contract for the lessee's signature. Mr. Lunan signed "Bad Toys, Inc. - Gambler, Inc." on the line labeled "LESSOR." The proof showed that at the time he signed the document, Mr. Lunan had not yet entered into a binding contract for the purchase of Gambler's assets. His act was therefore ineffective to bind Gambler, Inc., and his use of that company's name strengthens the implication that he was acting on the belief that he was not entering into a binding contract.

The only place on the contract where Mr. Lunan signed his own name was on the line labeled "GUARANTOR," where he signed "Larry N. Lunan, President." The plaintiffs' attorney was asked at oral argument if he could cite any case in which the court found that a party could be held liable as a guarantor on a contract where there was neither a separate contract of guaranty nor some language in the primary contract setting out the scope of the obligations assumed by the party signing it as guarantor. He responded that he did not know of any such cases, nor have we been able to find any. Nonetheless, the plaintiffs contend that Mr. Lunan's signature on the GUARANTOR line of the contract binds him to an absolute guarantee for payment of rent for five years, as well as all other financial obligations arising under the contract.[6] We believe that contention is without merit.

---

[6]Even if we found that Mr. Lunan had created an effective guaranty through his signature, we would also have to find that he did not sign in his personal capacity, but only in his corporate capacity as President of Bad Toys, Inc., in line with the rule that a corporate officer's signature, preceded by the corporation's name and followed by words denoting the officer's representative capacity, binds only the corporation. Tenn. Code Ann. § 47-3-403(3); *Bill Walker & Associates v. Parrish,* 770 S.W.2d 764, 770 (Tenn. Ct. App. 1989).

Of course the ambiguities of the contract did not prevent the plaintiffs and the defendants from entering into the respective roles of landlord and tenant. After the plaintiffs completed their purchase of the Hendersonville property, the defendants took over responsibility for the operation of the existing motorcycle business on the property and began paying rent to the plaintiffs in accordance with the amounts set out in the purported lease. It is thus beyond dispute that Bad Toys, Inc. became the tenant of the plaintiff landlords. But the payment of rent by a tenant does not signify that it has agreed to all the terms of a lease contract reciting such rent obligation. *See Strickland v. Cartwright*, 117 S.W.3d 766, 774 (Tenn. Ct. App. 2003) (there was no mutual assent to the terms of a lease agreement with option to buy even though tenant paid rent at the agreed-upon rate for six months before vacating the property). In the present case, the circumstances of the execution of the purported lease and the numerous irregularities in it show that the parties did not reach a meeting of the minds sufficient to create an enforceable contract between them.

## B. QUANTUM MERUIT

Because the parties failed to reach a meeting of the minds, we have concluded that insofar as the lease purported to bind Mr. Lunan personally or either of the companies to a five-year rental obligation, it is not a valid contract. However, even where a contract is invalid or unenforceable, the trial court may impose a contractual obligation on a defendant under the doctrine of *quantum meruit* to prevent unjust enrichment. *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d at 197; *Whitehaven Community Baptist Church v. Holloway,* 973 S.W.2d 592, 596 (Tenn. 1998); *Castelli v. Lien*, 910 S.W.2d 420, 427-428 (Tenn. Ct. App. 1995).

> A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:
>
> (1) There is no existing, enforceable contract between the parties covering the same subject matter;
> (2) The party seeking recovery proves that it provided valuable goods or services;
> (3) The party to be charged received the goods or services;
> (4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
> (5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d at 197-198 (quoting *Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998)); *Mitch Grissim & Associates v. BC/BST of Tennessee*, 114 S.W.3d 531, 547-48 (Tenn. Ct. App. 2002)

All the above-described circumstances are present in the case before us. The contract at issue is unenforceable, but the plaintiffs provided a valuable service to the defendants by allowing Mr. Lunan's company to occupy the premises of the property they owned. Mr. Lunan understood that the plaintiffs expected to be paid for the use of their property and that it would be unjust to occupy it without payment for the privilege. The defendants do not argue that the amount of the monthly rental set out in the lease contract was unreasonable. We accordingly hold that the plaintiffs are entitled to be paid for the rental value of the property between the date when the defendants stopped paying rent and the date the property was vacated, in accordance with the rates in the lease contract, as well as for the clean-up and repairs we discussed above.

As we suggested above, we find nothing in the record to indicate that Mr. Lunan intended to make himself personally liable for the rental payments. The rent on the premises was paid by checks drawn on the accounts of both his companies, and never on Mr. Lunan's personal account. Thus, we find that the plaintiffs are entitled to a judgment against Bad Toys, Inc., and Gambler, Inc., but not against Mr. Lunan personally. We direct the trial court to enter a judgment in accordance with our holding, including appropriate interest as determined by that court.

## IV.

The order of the trial court is reversed. We remand this case to the Circuit Court of Sumner County for any further proceedings necessary. Tax the costs on appeal to the appellees, Joy Lamberson McNaughten and Allen Wilson.

_____
PATRICIA J. COTTRELL, P.J., M.S.