IN THE COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

April 16, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

RALPH LEE, Administrator of ) C/A NO. 03A01-9806-CH-00195
the Estate of Raymond P. Lee, )
Deceased, )
                                       )
        Plaintiff-Appellee, )
                                         )
                                         )
                                         ) APPEAL AS OF RIGHT FROM THE
v. ) MONROE COUNTY CHANCERY COURT
                                         )
                                         )
                                         )
                                         )
BEE STRICKLAND, )
                                         ) HONORABLE EARL H. HENLEY,
        Defendant-Appellant. ) JUDGE

For Appellant                        For Appellee

J. REED DIXON                         EUGENE B. DIXON
Sweetwater, Tennessee           Koella & Dixon, Attorneys
                                         Maryville, Tennessee

O P I N I O N

AFFIRMED AND REMANDED                        Susano, J.

Ralph Lee ("Lee"), in his capacity as administrator of the Estate of Raymond P. Lee ("the Estate"), brought suit against the defendant, Bee Strickland ("Strickland"), alleging that Strickland had interfered with the harvesting of timber on the Estate's property. He sought injunctive relief and compensatory and punitive damages. Following a bench trial, the court below awarded the Estate compensatory damages of $15,000 plus pre-judgment interest. Strickland appeals, claiming that the judgment is "contrary to the evidence in this case." Lee, as appellee, argues that the award is inadequate and that it should, in any event, be tripled pursuant to the provisions of T.C.A. § 47-50-109.[1] We affirm.

## I. *Facts*

On December 3, 1993, Lee hired a logging company to harvest standing timber on 60 acres of property owned by the Estate in Monroe County. The Estate's property is adjacent to property owned by Strickland and is accessible via a right-of-way across the latter's property.[2]

---

[1]T.C.A. § 47-50-109 provides as follows:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

[2]The record indicates an earlier dispute regarding the right-of-way. Suffice it to say that a prior judgment of the trial court confirmed the Estate's right-of-way access across Strickland's property.

Shortly after it started harvesting timber on the Estate's property, the logging company hired by Lee experienced problems with Strickland. The logging company's owner, Michael Buckner ("Buckner"), testified that Strickland approached him "at the bridge on Mr. Lee's property and [Strickland] was standing there with a loaded shotgun in a readied position." He stated that Strickland had "both hands on the gun and one hand on the trigger." Strickland told Buckner that he "would be all right if [he] didn't cross the bridge." Several days after this incident, Buckner again found himself facing Strickland. Strickland told him that "it was going to cost [him, being Buckner]" if Buckner did not stop cutting the timber that was on Lee's property.

Strickland continued to harass the logging company. After Strickland told Buckner that he was going to "pop it to [him]" and subsequently threatened Buckner's crew, Buckner pulled his crew and equipment off the job because "it was becoming a life-threatening situation." He informed Lee that he would not complete the contract because of Strickland's interference.

In February, 1994, Lee obtained a court order that, in effect, restrained Strickland from interfering with the harvesting of the Estate's timber. However, when Lee asked Buckner to resume operations, Buckner declined to do so. Lee attempted to hire other loggers, but he was unable to persuade anyone to take up the logging job because, in the words of Lee's brother-in-law, "[no logging company] would come down there with the history and reputation of [Strickland]."

3

At the time of trial, there had been no additional harvesting of the subject timber. A consulting forester testified that 12 trees, apparently cut by Buckner's crew, were still on the ground; that several trees had blown over due to the logging of trees that had previously provided a shield from the wind; and that the remaining timber would be more difficult to harvest because of the "logging slash" and debris that was left from the earlier logging. However, he testified that the better trees on the Estate's property remained standing and that a logging company would not have to build as many roads to finish harvesting the timber. He further testified that the current market price for timber approximated the market price at the time of the contract.

Strickland did not attend the trial, but he was represented by counsel. At the time of trial, he was 78 years old and had recently had one leg amputated.[3] The trial court granted several continuances and attempted to accommodate Strickland's complaints that he could not negotiate the ramp leading into the courthouse. For example, the court at one time granted a continuance so the defendant could find someone to bring him into the courthouse in his wheelchair. The trial court proceeded with the trial after determining that "[Strickland] has had every opportunity on numerous occasions to be in court and he

---

[3]Strickland filed a motion with the Clerk of the Court of Appeals asking us to consider a report from his doctor that was received after the hearing below. We do not find that this motion is well taken; accordingly, it is denied.

4

just has not cooperated."[4]  After hearing the plaintiff's proof, the trial court awarded Lee $15,000 plus pre-judgment interest.

## II.  *Standard of Review*

Our review of this non-jury case is *de novo* upon the record of the proceedings below; however, that record comes to us with a presumption that the trial court's factual findings are correct.  Rule 13(d), T.R.A.P.  We must honor this presumption unless we find that the evidence preponderates against the trial court's findings.  ***Id.***; ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993); ***Matter of Gordon***, 980 S.W.2d 372, 376-77 (Tenn.App. 1998); ***Quarles v. Shoemaker***, 978 S.W.2d 551, 552 (Tenn.App. 1998).  The trial court's conclusions of law are not afforded the same deference, however, and we review those legal conclusions "*de novo* with no presumption of correctness." ***Premium Finance v. Crump Ins. Services***, 978 S.W.2d 91, 93 (Tenn. 1998); ***Stein v. Davidson Hotel Co.***, 945 S.W.2d 714, 716 (Tenn. 1997).

It is well-settled that the trial court is in the best position to assess the credibility of witnesses; accordingly, such determinations are entitled to great weight on appeal. ***Quarles***, 978 S.W.2d at 553; ***Massengale v. Massengale***, 915 S.W.2d 818, 819 (Tenn.App. 1995); ***Bowman v. Bowman***, 836 S.W.2d 563, 566 (Tenn.App. 1991).

---

[4]Strickland did not state as an issue in his brief the fact that the trial court proceeded in his absence, *cf*. Rule 27(a)(4), T.R.A.P.; but he alluded to this as error in the argument section of that document and at oral argument.  We find no abuse of discretion in the trial court's decision to proceed in Strickland's absence.

III.  *Analysis*

After reviewing the record in this case, we cannot say that the evidence preponderates against the trial court's finding that Strickland's actions amounted to a tortious interference with Lee's business relationship with the logging company.

The tort of interference with business relations is defined in **New Life Corp. v. Thomas Nelson, Inc.**, 932 S.W.2d 921 (Tenn.App. 1996):

> "The basic elements which establish a prima facie tortious interference with a business relationship are the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted."

*Id*. at 927 (quoting 45 Am.Jur.2d *Interference* § 50 (1969)).[5]  It is clear from the record in this case that a "valid business relation" existed between Lee and Buckner, and that Strickland was aware that Buckner intended to harvest the timber from Lee's property pursuant to that relationship.  It is further clear that on numerous occasions Strickland confronted Buckner and his employees in an aggressive, threatening manner.  Buckner

---

[5]The court in **New Life Corp**. borrowed the above quotation from its unreported decision in **Kan Const. & Cleaning Corp. v. Tatum**, No. 01A01-9304-CV-00150, 1993 WL 434741 (Tenn.App., W.S., filed Oct. 27, 1993).

6

testified that he left the job without harvesting the best timber, because

> it was becoming a life-threatening situation. A situation getting worse.  It was time to quit. [Strickland] was getting more bold and harass [sic] with his statements...it was a no win situation. Either get shot or shoot somebody....

This conduct is indicative of the ill will or malice that Strickland felt towards the harvesting of the timber on the Estate's property.  Malice or ill will is a necessary element of a tortious interference with business relations.  *Lann v. Third Nat. Bank in Nashville,* 277 S.W.2d 439, 440 (Tenn. 1955); *Testerman v. Tragesser,* 789 S.W.2d 553, 556-57 (Tenn.App. 1989).

The trial court heard testimony from Buckner touching on the first three elements of the subject tort.  From this testimony, it determined that Strickland's conduct "definitely created the problem."  As we have previously stated, the trial court is in the best position to assess the credibility of a witness.  *Quarles*, 978 S.W.2d at 553; *Massengale*, 915 S.W.2d at 819; *Bowman*, 836 S.W.2d at 566.  Therefore, we accept the trial court-accredited testimony of Buckner.  This being the case, we cannot say that the evidence preponderates against the trial court's finding that Strickland's conduct satisfies the first three elements of the tort under discussion.

Proof of damages is required to make out a prima facie case of interference with business relations.  *New Life Corp.*,

7

932 S.W.2d at 927.  In the instant case, there is no question but that the Estate was damaged when Buckner refused to complete the job because of Strickland's conduct.  The trial court heard testimony from a consulting forester to the effect that, although the best timber remained standing on the property, harvesting it would be more expensive because of Strickland's tortious conduct:

> Q: As a logger, excuse me, as a forester not logger, but [as a] forester you have the knowledge of logging, in your opinion would it cost more now to log this particular piece of property as opposed to finishing back in 1993?
>
> A: It would except for there is an advantage of the road being in there now.  So the person who comes in now would not have to build as many roads, but still it would be distracting for someone to go through the logging--to get what good timber is left.  But the road building would be--offset that somewhat.
>
> \* \* \*
>
> Q: Do you think this would be--have difficulty in getting a logger to come and fix this up?
>
> A: Most loggers don't want to follow up somebody, their mess that's just the bottom line.  And it wouldn't attract for the price of the timber.
>
> \* \* \*
>
> Q: You don't think that you could get a logger to go in there for fifty percent of the profit, I mean, fifty percent of the sale price for the trees to do it?  That's what this was.
>
> A: No.  That defeats--you might could do it for twenty-five to thirty percent [to the landowner].

8

The trial court determined that Lee should be awarded $15,000 in damages plus pre-judgment interest. Based on our *de novo* review of the evidence in the record, we cannot say that this award is excessive. Rule 13(d), T.R.A.P. The trial court has wide discretion to affix a reasonable amount of damages in a non-jury case as long as the amount is within the credible proof established at trial and within the range of reasonableness as defined by the Supreme Court. **Ellis v. White Freightliner Corp.**, 603 S.W.2d 125, 126-27 (Tenn. 1980).

Although Strickland urges us to grant a remittitur on appeal, we are disinclined to do so. It is clear from the record that the trial court's award of damages is consistent with the credible proof adduced at trial and that it is reasonable based on the record before us. **Ellis**, 603 S.W.2d at 126-27.

Lee also raises an issue in his brief regarding the amount of damages. He argues that the judgment is insufficient and that, in any event, the Estate is entitled to treble damages under T.C.A. § 47-50-109. However, he did not allude to this statute in his complaint, nor is there any mention of this contention in the record before us. It is well-settled that

> [t]his Court can only consider such matters as were brought to the attention of the trial court and acted upon or [pretermitted] by the trial court.

**Stewart Title Guaranty Co. v. FDIC**, 936 S.W.2d 266, 271 (Tenn.App 1996) (quoting **Irvin v. Binkley**, 577 S.W.2d 677, 679 (Tenn.App.

9

1978)).  This issue was not raised below; therefore, it was and is waived as far as this appeal is concerned.  ***Civil Services Merit Bd. of The City of Knoxville v. Burson,*** 816 S.W.2d 725, 735 (Tenn. 1991).

IV.  *Conclusion*


        The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellant.  This case is remanded to the trial court for such further proceedings as may be necessary and for the collection of costs assessed below, all pursuant to applicable law.


                                    _____
                                    Charles D. Susano, Jr., J.


CONCUR:


_____
Houston M. Goddard, P.J.


_____
Herschel P. Franks, J.

11